**Opinion issued December 8, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00834-CR

_____

**JOHN CRUZ BUENTELLO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case No. 1450047**

## O P I N I O N

John Buentello was convicted of aggravated sexual assault of a child[1] and sentenced to life imprisonment. He argues that there was legally insufficient evidence of a necessary element of the offense: penetration. He also challenges

---

[1] TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i).

three of the trial court's rulings during his trial: (1) overruling his objection that the outcry witness's testimony was inadmissible because the child's outcry was not reliable and the forensic examiner designated as the outcry witness was not the first adult the child told of the abuse, (2) denying his motion for continuance, and (3) denying his motion for mistrial. We affirm.

## Background

Buentello lived out-of-state but would visit his son and his son's family in the Houston area occasionally. The son had a blended family with five children, including Amy,[2] who was Buentello's son's step-daughter.

According to Amy's mother, Buentello visited only occasionally in the beginning and would spend equal time with all the children. Over time, though, his visits became more frequent—sometimes more than once a month—and he began to spend more of his time focused on Amy. When Amy was 10, she disclosed to her step-father that Buentello had touched her when she was seven years old.

Amy's step-father—who is Buentello's son—described what happened the night that Amy first disclosed that Buentello had touched her. He testified that his oldest daughter woke him late one night, crying. She took him to Amy's bedroom, where Amy was sitting on the floor and also crying. Amy was reluctant to talk about why she was upset. Eventually she told her step-father that something bad

---

[2] To protect her privacy, we identify the complainant by a pseudonym.

2

had happened because of Buentello. He immediately woke up Amy's mom, and Amy told her mom, in general terms, that Buentello had touched her.

The next morning, Amy's mom called Child Protective Services, which referred Amy to The Children's Assessment Center to be interviewed by a forensic investigator, Susan Odhiambo. The forensic investigator explained to the jury that she is charged with obtaining facts necessary to investigate accusations of sexual abuse of a child. Odhiambo conducts multiple child interviews each day.

Odhiambo recorded her interview of Amy. In that interview, Amy established that she knew the difference between a truth and a lie, and she promised to tell the truth. Then Amy described specific details about Buentello's past conduct toward her. Odhiambo testified that Amy was "certain" about her recollection and "consistent" with her description of who had assaulted her, the time frame of the assault, and the location where it occurred.

Two years later, at Buentello's trial, Amy testified that Buentello assaulted her late one evening while he was visiting from Louisiana. Amy said that it happened in 2010, when she was seven. That night, when everyone else went to bed, she went to her bedroom to watch television. About twenty minutes later, she became thirsty and went to the kitchen for a drink. Buentello was lying on the couch in the study. He called her over in a stern voice. When she complied, he told her, again in a stern voice, to sit on the couch. She hesitated, and he told her in a

3

harsher voice to sit down. Then he told her to lie down. He laid behind her, with his arms wrapped around her and a blanket spread over them, in silence, for about five minutes. She felt "uncomfortable" and "awkward" and wanted to leave, so she told him she was hot and stood to go to her room. He said, "No, just take your clothes off." She told him no.

Buentello stood up, raised her arms above her head, and tried to take her shirt off. Amy resisted, but he took off her shirt and then the rest of her clothes. He then pushed her to the couch. He laid behind her and told her to go to sleep.

Buentello began rubbing Amy's legs. She testified that he then moved "towards my vagina." When asked whether he "was touching your vagina on the outside or on the inside," she testified, "On the inside." She stated that he began "moving around . . . forward and back" and that whatever was touching her was "warm and soft and it hurt."

When a noise came from the stairs, Buentello told her to go to her room. She did. Buentello stayed with the family the rest of the weekend; Amy did not tell anyone what happened.

Amy testified that what Buentello did to her that night made her feel "scared" and "disgusted." She testified about additional disturbing events involving Buentello touching her. She said that Buentello would unexpectedly put lotion on his hands and rub her legs. Twice when he did this, he reached far into

4

her shorts. On another occasion, he commented to her that her "butt" and "boobs" were "growing."

Amy's mother testified about two more strange events involving Buentello that occurred in 2013, when Amy was 10. During a visit, Buentello asked Amy's mother if Amy's younger sister could nap with him in Amy's bedroom. According to Amy's mother, Amy insisted to her that Buentello not be allowed to nap with the young girl. Amy said she "was afraid that Grandpa was going to hurt her little sister."

The second strange event involved Buentello's asking to take Amy to Louisiana to stay with him. Amy's mother testified that she offered to let Amy and her brother visit Buentello together, but Buentello said no. Buentello became angry with Amy's mother because she would not allow Amy to stay with him alone.

Although Amy's mother thought these two events were strange, at the time she trusted Buentello. However, looking back on these two specific events and reflecting on Amy's behavior during that time, Amy's mother testified that there were signs that Amy was uncomfortable: she had begun to avoid Buentello during his visits and would stay physically close to her when he was nearby.

Around this same time, when Amy was 10 and Buentello was not in the home, Amy and her older sister were in Amy's room, laughing and talking. Amy opened her dresser and unexpectedly saw Buentello's Bible in her dresser drawer.

The realization that he had recently been in her bedroom upset her, and she began to cry. Her sister asked why she was upset. When Amy told her about Buentello, her sister was "in shock." That is when Amy's sister persuaded her to tell her parents, and they woke her step-father to tell him what Buentello had done.

The Children's Assessment Center forensic investigator, Susan Odhiambo, testified as the designated outcry witness. Before trial began, Buentello had challenged whether Odhiambo was the proper outcry witness because Amy had spoken to her step-father and her mother first. He did not call any witnesses in support of his challenge. The State responded that Odhiambo was the first person to whom Amy disclosed sufficient details of the encounter to qualify it as an aggravated sexual assault. The trial court denied Buentello's challenge and designated the CAC investigator, Odhiambo, as the outcry witness.

During her testimony, Odhiambo recounted Amy's description of the assault, including Amy's statement that Buentello "was playing with her private." When asked whether Amy confirmed that Buentello had touched inside her, and not just outside her vagina, Odhiambo responded, "She said it three different times." Buentello's counsel asked whether Amy prefaced her statements about penetration with the phrase "I think," and Odhiambo confirmed that she had, but she also indicated that Amy's phrasing was an affirmation that she had been penetrated: "She said she thinks she was, yes."

6

Another trial witness was Amy's therapist, Stephanie Legendre. About eleven months before trial, the State notified Buentello that Legendre would be testifying as an expert and provided her name and address. Next to her name was the notation, "Therapist/Child Expert." When Buentello realized, during trial, that Legendre was going to testify that Amy has post-traumatic stress disorder, he indicated surprise and moved for a continuance. His motion was denied.

Legendre testified that she is a licensed professional counselor who specializes in child sexual-abuse victims. She has been treating Amy for two years. According to Legendre, Amy avoids discussing the assault, and, when she does discuss it, she demonstrates emotions of "shame and embarrassment." In their sessions, Legendre has observed evidence of trauma, including hypervigilance (described as a startle response), depression, irritability, shame, suicidal ideations, failure to accept nurture, self-inflicted cuts, and poor self-image.

Legendre opined that Amy's "core issue" is post-traumatic stress disorder, which she described as avoidance of discussing a traumatic issue, intrusion of memories, nightmares, hypervigilance, extreme reactiveness, and altered cognition (described as having a distorted view of oneself as "disgusting or ugly or fat").

Legendre also discussed the concept of grooming, in which an offender identifies a child's vulnerabilities, uses those to build a relationship with the child, increases attention to the child, and then uses the developed relationship to coerce

the child into sexual contact. Legendre also explained how children commonly disclose sexual assault. She testified that a delayed outcry, like Amy's, is common and that an outcry is typically a process in which the child will give more information about the sexual assault over time.

Harris County Sheriff's Office Deputy J. Pietsch testified about his criminal investigation. He testified that, early on in the investigation, he attempted to speak with Buentello. When asked whether he was able to obtain a statement from Buentello, Pietsch responded, "I was advised that the defendant had obtained legal counsel." At that point, Buentello's counsel made a non-specific objection, and the trial court sustained it. He moved to have the jury instructed to disregard the statement, and the trial court gave the jury that instruction. He then moved for a mistrial, but the trial court denied his motion.

Pietsch was then asked whether Buentello had ever agreed to give a statement. He answered, "No," which was immediately followed by a sustained "asked and answered" objection. Again, Buentello moved for a mistrial, and his motion was denied.

Buentello did not testify during the guilt/innocence phase of the trial. The focus of his closing argument was that the offense of aggravated sexual assault required proof of penetration beyond a reasonable doubt. He argued that the evidence was insufficient to find penetration and, to the extent the jury believed

that there had been any touching, they should convict only on the lesser-included offense of indecency with a child. The jury convicted Buentello of aggravated sexual assault of a child.

During the punishment phase of the trial, two adult sisters testified about events that occurred when they were children parishioners at a church in Corpus Christi that had been led by Buentello. The younger sister testified about indecent physical contact Buentello had with her. The older sister testified that Buentello had sexually assaulted her, including engaging in intercourse, when she was fourteen. They and other witnesses asked that Buentello be given a life sentence.

Buentello testified that he is a 70-year-old man who is in poor health and fears dying in prison. He denied any wrongdoing with Amy or the two sisters who had testified. He said he hoped, "if [he] made [Amy] uncomfortable, made her not feel special, that she can get over it." He also expressed his hope that the family would be "able to forgive and be[ ] able not to make a mountain out of a molehill."

The jury sentenced Buentello to life imprisonment. Buentello appeals his conviction.

## Legal Sufficiency

In his first issue, Buentello argues that there is legally insufficient evidence that he penetrated Amy. While he acknowledges that Amy testified that there was

penetration, he argues that deficiencies in her testimony "overwhelmingly outweigh" evidence of penetration.

## A. Standard of review

We review sufficiency of the evidence using the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318−20, 99 S. Ct. 2781, 2788–89 (1979). *See Brooks v. State*, 323 S.W.3d 893, 898–912 (Tex. Crim. App. 2010). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider all reasonable inferences that may be drawn from the evidence in making our determination, including all direct and circumstantial evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Evidence is insufficient in four circumstances: (1) no evidence exists that is probative of an element of the offense in the record; (2) only a "modicum" of evidence exists that is probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the alleged acts do not establish the criminal offense charged. *See Jackson*, 443 U.S. at 314, 320, 99 S. Ct. at 2786, 2789; *Laster*, 275 S.W.3d at 518; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The jury has the exclusive role of evaluating the facts, the credibility of the witnesses, and the weight a witness's testimony should be given. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). The jury may choose to believe all, some, or none of a witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.). And the jury alone must reconcile any conflicts in the evidence. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000).

Under the *Jackson* standard, we defer to the factfinder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. If there are conflicts in the evidence, we must presume the factfinder resolved the conflicts in favor of the verdict and defer to that determination, as long as it is rational. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Penagraph*, 623 S.W.2d at 343 ("A jury is entitled to accept one version of the facts and reject another or reject any of a witness'[s] testimony."). Contradictory evidence will not diminish the legal sufficiency of the evidence that supports the verdict. *See McDonald v. State*, 462 S.W.2d 40, 41 (Tex. Crim. App. 1970). If the evidence is insufficient, we must reverse and enter an order of acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41, 102 S. Ct. 2211, 2218 (1982).

11

**B.     Legally-sufficient evidence of penetration**

A person commits the offense of aggravated sexual assault of a child if that person intentionally or knowingly "causes the penetration of the anus or sexual organ of a child by any means." *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i). Outcry testimony can be legally sufficient evidence to support a conviction without corroboration or substantiation. *Eubanks v. State*, 326 S.W.3d 231, 241 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

Amy testified, unequivocally, that Buentello penetrated her. She did not know whether it was his finger, penis, or some other object, but it touched her "on the inside," was "moving around," and "hurt" her. This testimony provides legally-sufficient evidence of penetration. Any of the alleged deficiencies in her testimony—such as whether Amy told the forensic investigator, Odhiambo, during her interview about the penetration or disclosed additional aspects of the assault at trial that she had not previously mentioned—do not diminish the legal sufficiency of her direct trial testimony on the issue. *See Penagraph*, 623 S.W.2d at 343. We hold that Amy's trial testimony provided legally sufficient evidence of penetration and overrule Buentello's first issue.

### Forensic Investigator's Outcry-Witness Testimony

In his second and fourth issues, Buentello argues that the CAC's forensic investigator, Odhiambo, should not have been allowed to testify as a designated

outcry witness. First, he argues that Odhiambo was not the proper outcry witness because Amy told her step-father and mother about the sexual assault first.[3] Second, Buentello argues that Amy's outcry was not reliable.

## A.     Standard of review

A trial court has "broad discretion" in admitting outcry-witness testimony. *Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990). We will not reverse the trial court's decision to admit outcry-witness testimony unless it falls outside the zone of reasonable disagreement. *Id.*; *Tear v. State*, 74 S.W.3d 555, 558 (Tex. App.—Dallas 2002, pet. ref'd).

## B.     The trial court did not abuse its discretion in determining that the forensic investigator was the proper outcry witness

The Texas Code of Criminal Procedure allows admission of certain hearsay testimony in the prosecution of sexual offenses against minors. TEX. CODE CRIM. PROC. ANN. art. 38.072. The statute allows the designation of an outcry witness to testify about a child's disclosure of abuse but requires that the outcry witness be the "first person, 18 years of age or older, other than the defendant, to whom the child made a statement about the offense." *Id.* § 2(a)(3); *Garcia*, 792 S.W.2d at 91. To qualify, the disclosure must include more than "a general allusion that something in the area of child abuse was going on." *Garcia*, 792 S.W.2d at 91. It

---

[3]     Amy's older sister did not qualify as the outcry witness because an outcry witness must be over 18 at the time of the outcry and Amy's sister was younger than that at that time. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a)(3).

must "in some discernible manner describe[] the alleged offense." *Id.* This furthers the societal interest in curbing child abuse by preventing the designation of a person who only received a vague suggestion of abuse over a later-in-time person who received a more detailed account of sexual abuse. *See id.*

Buentello argues that the State failed to prove that Amy did not provide specific details about the abuse to her parents during their late-night conversation that occurred before Amy was interviewed by the forensic investigator.

There was no testimony regarding what, exactly, Amy said to her parents that night. Buentello did not call any witnesses when he challenged the investigator's designation as the outcry witness. Both Amy and her parents testified on direct examination that Amy did not give them any specifics and, instead, spoke only in "general" terms.

The burden was not on the State to prove a lack of sufficient disclosure in these earlier conversations; instead, it was Buentello's burden to establish that one of the parents was the proper outcry witness instead of the later-in-time forensic interviewer. *See id.* at 91–92 (stating that defendant had burden to establish that other person was proper outcry witness); *cf. Davis*, 345 S.W.3d at 78 (appellant must provide record to show trial court abused its discretion).

Buentello's attorney did not question Amy on what she told her parents, nor did he question the step-father or mother on what specifics Amy told them.

14

Buentello presents no evidence of how Amy described the events to her parents or whether those descriptions were detailed enough to describe the offense of aggravated sexual assault. Thus, we cannot say that the trial court abused its broad discretion in overruling Buentello's objection to Odhiambo being designated the outcry witness.

We overrule Buentello's second issue.

## C. The trial court did not abuse its discretion in concluding that Amy's statement was sufficiently reliable

Before a designated outcry witness may testify about the child's disclosure, the trial court must find, "in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement." TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(2). "The phrase 'time, content, and circumstances' refers to 'the time the child's statement was made to the outcry witness, the content of the child's statement, and the circumstances surrounding the making of that statement.'" *Broderick v. State*, 89 S.W.3d 696, 699 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (quoting *MacGilfrey v. State*, 52 S.W.3d 918, 921 (Tex. App.—Beaumont 2001, no pet.)).

In such a hearing, the trial court's focus is whether the child's outcry statement is reliable, not whether the outcry witness is credible. *Sanchez v. State*, 354 S.W.3d 476, 487–88 (Tex. Crim. App. 2011); *see* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(2). The trial court considers the circumstances of the

15

outcry, not the abuse itself. *Sanchez*, 354 S.W.3d at 487. Outcry reliability is determined on a case-by-case basis. *Davidson v. State*, 80 S.W.3d 132, 139 (Tex. App.—Texarkana 2002, pet. ref'd).

Outcry testimony admitted in compliance with Article 38.072 is considered substantive evidence and is admissible for the truth of the matter asserted in the testimony. *Duran v. State*, 163 S.W.3d 253, 257 (Tex. App.—Fort Worth 2005, no pet.).

Buentello challenged the reliability of Amy's outcry, and the trial court overruled his challenge. On appeal, he notes that some intermediate appellate courts have enumerated eleven "indicia of reliability" that a trial court may consider in determining the reliability of a child's outcry.[4] *See Buckley v. State*,

---

[4] The Texarkana court has listed eleven factors that trial courts may consider to evaluate the reliability of an outcry:

> (1) whether the victim testifies at the trial and admits making the out-of-court statement; (2) whether the child is of a level of maturity to understand the need to tell the truth and to have the ability to observe, recollect, and narrate; (3) whether the child's out-of-court statement is corroborated by other evidence; (4) whether the child's out-of-court statement was spontaneously made in the child's own terminology or whether there is evidence of prior prompting or manipulation by adults; (5) whether the child's out-of-court statement is clear and unambiguous and rises to the needed level of certainty; (6) whether the statement is consistent; (7) whether the statement describes an event that a child of his or her age could not be expected to fabricate; (8) whether there is abnormal behavior by the child after the contact; (9) whether there is a motive for the child to fabricate the out-of-court statement; (10) whether the statement is against the interest of the child, e.g., the child expects punishment because of reporting the conduct; and (11) whether there was an

758 S.W.2d 339, 343–44 (Tex. App.—Texarkana 1988), *aff'd on other grounds*, 786 S.W.2d 357 (Tex. Crim. App. 1990); *see also Torres v. State*, 424 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *In re M.R.*, 243 S.W.3d 807, 813 (Tex. App.—Fort Worth 2007, no pet.); *Norris v. State*, 788 S.W.2d 65, 71 (Tex. App.—Dallas 1990, pet. ref'd); *but see Broderick*, 89 S.W.3d at 699 (stating, "Although courts have enumerated factors that may assist in ascertaining the reliability of an outcry statement, the focus of the inquiry must remain upon the outcry statement, not the abuse itself" and holding that child's outcry may be reliable even if it contains vague or inconsistent statements about details of sexual abuse); *Carty v. State*, 178 S.W.3d 297, 306–07 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (considering reliability based on time, content and circumstances of child's statement, without reference to *Buckley* multi-factor test); *Jones v. State*, No. 10-13-00106-CR, 2014 WL 3556520, at *3–4 (Tex. App.—Waco July 3, 2014, pet. ref'd) (mem. op., not designated for publication) (rejecting mechanical application of *Buckley* factors). However, he does not analyze Amy's outcry in light of all eleven factors. Instead, he identifies three aspects of Amy's disclosure that he argues demonstrate its unreliability. We address each in turn.

opportunity under the evidence for the alleged act to have been committed by the defendant.

*Buckley v. State*, 758 S.W.2d 339, 343–44 (Tex. App.—Texarkana 1988), *aff'd on other grounds*, 786 S.W.2d 357 (Tex. Crim. App. 1990) (not addressing factors listed by intermediate appellate court).

17

First, he argues that Amy did not tell Odhiambo that Buentello had penetrated her. Odhiambo testified that Amy did disclose penetration. But, even if she did not, inconsistency in a child's outcry and later trial testimony "is a matter of credibility and goes to the weight of the evidence," not the reliability of the statement or its admissibility. *Marquez v. State*, 165 S.W.3d 741, 747 (Tex. App.—San Antonio 2005, pet. ref'd).

Second, Buentello argues that the State did not present any other witness or physical evidence to corroborate Amy's outcry statement. But neither corroboration nor physical evidence is required for an outcry to be determined reliable. *See Gonzales v. State*, 477 S.W.3d 475, 479 (Tex. App.—Fort Worth 2015, pet. ref'd). Furthermore, when a lengthy period of time passes between an assault and a child's outcry, "little weight" should be given to the lack of physical evidence in determining whether the outcry was reliable. *Naranjo v. State*, No. 06-03-00056-CR, 2004 WL 420145, at *2 (Tex. App.—Texarkana Mar. 9, 2004, pet. ref'd) (mem. op., not designated for publication).

Third, Buentello argues that the outcry was unreliable because it occurred two to three years after the alleged assault. Amy's therapist, Legendre, testified that it is "typical" for children to delay disclosing abuse for "months or years." In her opinion, a delayed outcry is more common than a close-in-time disclosure. Moreover, "delay in the report of sexual abuse is to be expected when there is a

18

close personal relationship between the victim and the perpetrator . . . ." *Madrid v. State*, No. 08-15-00195-CR, 2016 WL 3092575, at *5 (Tex. App.—El Paso June 1, 2016, no pet.) (mem. op., not designated for publication). Legendre's testimony indicates that an outcry that occurs two to three years after abuse may be reliable, and Buentello does not cite to any authority suggesting the span of time required to call into question the reliability of an outcry from a child abused at a young age.

Timing is one of three factors that the statute requires trial courts to consider when analyzing the reliability of an outcry. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(2) (stating that reliability is determined "based on the time, content, and circumstances of the statement"); *Carty*, 178 S.W.3d at 306. The trial court did not abuse its discretion in determining that the content and circumstances of Amy's disclosure supported a conclusion of reliability. As the trial court noted when it ruled, the outcry statement was made at the CAC very shortly after the initial disclosure, and Amy acknowledged that she knew the difference between a lie and the truth when she gave the statement. Further, as Odhiambo discussed, Amy responded to open-ended questions by using terminology consistent with her age to describe a sexual act that is beyond the common understanding of a child her age. Moreover, the disclosure occurred immediately after Amy realized that Buentello had been in her bedroom, and her outcry was generally consistent with the trial testimony. *See Carty*, 178 S.W.3d at 307 (concluding that child's outcry was

19

reliable because child disclosed abuse even after being told not to talk about it, confirmed knowing difference between lies and truth, promised to be truthful, used immature language to describe assault, and disclosed it in response to open-ended questions and in manner that was consistent with trial testimony).

We conclude that a three-year delay by a young child in disclosing sexual abuse by a relative does not, by itself, demonstrate unreliability to the extent that would require a conclusion that the trial court was outside the zone of reasonable disagreement in admitting the statement. *See Davidson*, 80 S.W.3d at 139 (on mixed evidence of reliability, concluding trial court did not err by concluding that outcry was reliable and admitting testimony of outcry statement).

We overrule Buentello's fourth issue.

### Prosecutor's Questions about Buentello's Pre-Arrest Refusal to Give a Statement

In his third issue, Buentello challenges the State's attempt to ask a testifying police officer whether, during his crime investigation, he contacted Buentello to request a statement and whether Buentello gave him a statement. Although the trial court sustained Buentello's objections during this line of questioning and granted his motion to instruct the jury to disregard an answer by Deputy Pietsch, Buentello argues that the "attempt to introduce evidence that [he] refused to cooperate with the police by giving a statement was the equivalent of a comment on [his] failure to

20

testify" and required a mistrial. He argues that the trial court erred when it denied his motion for mistrial.

## A.    Standard of review

We review the trial court's denial of a defendant's motion for mistrial for an abuse of discretion. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999); *Williams v. State*, 417 S.W.3d 162, 172 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). A trial court may declare a mistrial when an error occurs that is so prejudicial that the expenditure of further time and expense would be wasteful. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). Whether a trial court abused its discretion in denying a motion for mistrial depends on whether the court's instruction cured any prejudicial effect. *See Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995); *Faulkner v. State*, 940 S.W.2d 308, 312 (Tex. App.—Fort Worth 1997, pet. ref'd). Generally, an instruction to disregard cures the prejudicial effect. *Dinkins*, 894 S.W.2d at 357; *Woodall v. State*, 77 S.W.3d 388, 399 (Tex. App.—Fort Worth 2002, pet. ref'd). However, a comment may be so egregious or inflammatory as to render the instruction ineffective in curing the prejudice. *See Dinkins*, 894 S.W.2d at 357; *Woodall*, 77 S.W.3d at 400.

## B.    The questioning Buentello challenges

During the State's direct examination of Deputy Pietsch, the officer testified that he attempted to contact Buentello during the early stage of his investigation

but was unable to speak with him. He was asked whether he requested Buentello to give a statement. Pietsch answered that he had requested a statement but was told that Buentello had a lawyer. Buentello interrupted the answer to assert a non-specific objection, which was sustained. He then successfully obtained an instruction to the jury to disregard Pietsch's answer. Buentello also moved for a mistrial, but his motion was denied.

The State's next question to Pietsch was whether he had requested a statement from Buentello. Pietsch answered affirmatively, without objection. The State next asked whether Buentello ever agreed to give a statement. Pietsch answered, "No." Buentello asserted an "asked and answered" objection, which the trial court sustained. The State asked the same question twice more, and both times the trial court sustained Buentello's "asked and answered" objections. Buentello moved for a mistrial, but the court again denied his motion.

## C. The trial court did not abuse its discretion by denying motion for mistrial

Buentello argues that the State's line of questioning was "equivalent" to a comment on his failure to testify at trial. The right not to testify in one's own criminal trial is protected by the Fifth Amendment to the United States Constitution, which states, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.

"The plain language of the Fifth Amendment protects a defendant from *compelled* self-incrimination." *Salinas v. State*, 369 S.W.3d 176, 179 (Tex. Crim. App. 2012), *aff'd*, 133 S. Ct. 2174 (2013). But a suspect's interactions with police officers are not compelled in "pre-arrest, pre-*Miranda* circumstances." *Id.* (referencing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966)). Therefore, a suspect's decision to remain silent in a pre-arrest encounter does not implicate the Fifth Amendment right against compulsory self-incrimination. *Id.*

The Fifth Amendment "is 'simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak." *Id.* (quoting *Jenkins v. Anderson*, 447 U.S. 231, 241, 100 S. Ct. 2124, 2131 (1980) (Stevens, J., concurring)). Accordingly, a prosecutor can comment on pre-arrest silence at trial without implicating the Fifth Amendment. *See id.*; *Morales v. State*, 389 S.W.3d 915, 921–22 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (holding that prosecutor's exchange with investigator, which confirmed that defendant did not respond to investigator's attempts to call him, was admissible because these actions constituted pre-arrest, pre-*Miranda* silence).

According to Pietsch's testimony, during the first week of his investigation, he reviewed Amy's forensic interview and interviewed her parents. During the second week of his investigation, he requested a copy of Amy's sexual-assault-examination records and called Buentello to attempt to interview him. Buentello

had not been arrested. He had not been formally charged with assaulting Amy. There is no evidence he had had any contact with the police, at that point, other than the phone call. At that stage of the investigation—before his arrest and before being read his *Miranda* rights—Buentello's silence was not protected by the Fifth Amendment right against compelled self-incrimination. *See Salinas*, 369 S.W.3d at 179. As such, the prosecutor was permitted to comment at trial on that silence. *Id.*

Because the State's line of questioning did not implicate Buentello's Fifth Amendment right against compelled self-incrimination and, therefore, was not objectionable on that basis, Buentello's argument that the line of questioning required a mistrial fails.[5] We overrule his third issue.

### Motion for Continuance

In his fifth issue, Buentello argues that the State did not give him adequate notice regarding one of its witnesses, Amy's treating therapist, Stephanie Legendre. He contends that the trial court erred by denying his motion for continuance based on the lack of adequate notice.

Buentello does not argue that the State failed to disclose Legendre's identity. Instead, he argues that he was not told that she would testify that she had

---

[5]  Alternatively, we would hold that Buentello did not preserve his Fifth Amendment arguments for appeal. To preserve an issue for appeal, the party must present a timely objection to the trial court, state specific grounds for that objection, and obtain a ruling. TEX. R. APP. P. 33.1(a). Buentello did not present his argument to the trial court that his Fifth Amendment right to remain silent was violated by the prosecutor's line of questioning; he only objected generally, without a specific basis given, and then objected that the question had been "asked and answered."

24

diagnosed Amy with post-traumatic stress disorder. When he moved for a continuance, he argued that "his defense would be prejudiced by . . . not [being] provided with any documents related to [Legendre's] testimony of PTSD with which to fully investigate for cross-examination."

## A. Standard of review

A trial court has "broad discretion" in determining whether to grant a motion for continuance. *McAleer v. McAleer*, 394 S.W.3d 613, 616 (Tex. App.—Houston [1st Dist.] 2012, no pet.). To show that the trial court abused its broad discretion in denying the motion, the movant must show that (1) the trial court wrongly denied the motion and (2) the movant was prejudiced by the denial. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010). The trial court wrongly denies such a motion when "the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial." *Id.*

## B. The trial court did not abuse its discretion by denying Buentello's motion for continuance

"Generally, notice of the State's witnesses must be given upon request by the defense." *Hamann v. State*, 428 S.W.3d 221, 227 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). The Code of Criminal Procedure outlines the requirements for the notice the State must provide:

> On a party's request . . . the party receiving the request shall disclose to the requesting party *the name and address* of each person the disclosing party may use at trial to present evidence under Rules 702, 703, and 705, Texas Rules of Evidence.

TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (emphasis added).

The State provided this required notice. About eleven months before trial, the State disclosed a list of witnesses that it intended to call at Buentello's trial, including Legendre. The notice included the name and address of each witness, and—in addition to the statutory requirements—a brief description of each witness. Legendre's name and address was included on this notice, along with the following brief description: "Therapist/Child Expert."

Buentello argues that the State should have provided even more information—that the therapist would discuss Amy's PTSD diagnosis. But Buentello does not cite any authority to support his argument that the State was required to provide this information, and we decline to hold that it was required. Because the State gave Buentello the required notice about its expert witness—and more—we hold that the trial court did not abuse its discretion by denying the continuance motion.

We overrule Buentello's fourth issue.

## Conclusion

We affirm Buentello's conviction.

Harvey Brown
Justice

Panel consists of Justices Jennings, Keyes, and Brown.

Publish. TEX. R. APP. P. 47.2(b).

27