

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RUBIN SANCHEZ, | § | No. 08-16-00117-CR |
| Appellant, | § | Appeal from |
| v. | § | 11th District Court |
| THE STATE OF TEXAS, | § | of Pecos County, Texas |
| Appellee. | § | (TC # P-3493112-CR) |
| | § | |

**O P I N I O N**

The State indicted Appellant Ruben Sanchez on six counts of aggravated sexual assault of a child, and two counts of indecency with a child. The child made an outcry of these events to three persons. Outcry statements are classically hearsay, but Texas sidesteps that objection when the proponent satisfies several predicates set out in TEX.CODE CRIM.PROC.ANN. art. 38.072 (West Supp. 2017). In this case, the trial court permitted all three persons to testify to the outcry statements, but attempted to limit the testimony such that each "outcry" witness testified to different incidents raised by the eight-count indictment. Following his conviction on multiple counts, Appellant complains that the trial court erred in permitting overlapping hearsay testimony from two of the outcry witnesses. We conclude that the trial court did not abuse its discretion in allowing the testimony, and we affirm the conviction below.

## BACKGROUND

From age two until she was almost eight years old, B.W. lived in Fort Stockton with her mother.[1] B.W.'s mother struggled with drug addiction. Consequently, B.W. spent some amount of time at her grandmother's house in Fort Stockton. And for a time, Appellant was living with B.W.'s grandmother; some in fact thought them married. Two of B.W.'s aunts also lived in the grandmother's house, but between work and school schedules, B.W. spent some time alone in the house with Appellant. Even after Appellant broke-up with B.W.'s grandmother in June of 2010, he continued to see B.W. from time to time, buying her toys, and taking her to his parent's and his new girlfriend's residence.

When the mother's drug addiction worsened, Child Protective Services arranged for B.W. to live with her father in Mississippi. That arrangement did not work out, and B.W. found herself living with her Aunt Melinda in Florida. While there, B.W. informed Melinda of two inappropriate sexual incidents involving Appellant. After the authorities were notified, a forensic interviewer, Victoria Smith, elicited the details of several additional encounters. Sometime later, B.W. lived with her Aunt Jennifer, who learned of several more incidents.

Florida authorities alerted their Texas counterparts, and a Pecos County grand jury issued an eight-count indictment charging Appellant with these crimes against B.W., all on or about the stated date:

1. May 15, 2008, penetrating the anus of a child younger than six with his sexual organ;

2. May 15, 2009, penetrating the anus of a child younger than six with his sexual organ;

3. May 15, 2010, penetrating the anus of a child younger than fourteen with a dog's

---

[1] To protect the anonymity of the child in this case, we use an alias to refer to her, and provide only the given names, or generic references to other family members. *See* TEX.R.APP.P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex.Crim.App. [Panel Op.] 1982).

2

sexual organ;

4. July 15, 2011, penetrating the anus of a child younger than fourteen with his sexual organ;

5. August 15, 2011, with intent to arouse or gratify sexual desire, exposing his genitals to child younger than seventeen;

6. August 15, 2011, penetrating the mouth of a child younger than seventeen with his sexual organ;

7. September 15, 2011, penetrating the anus of a child younger than fourteen with his sexual organ;

8. June 12, 2012, with the intent to arouse or gratify sexual desire, touching the genitals of child younger than seventeen.

B.W. testified at trial; she was eleven at the time. She related that while living with her grandmother in Fort Stockton, Appellant lived in the house for a time. She referred to Appellant as Grandpa. She described to the jury a time when Appellant pulled down her pants, bent her over a bed, pulled down his pants, and penetrated her "butt" with his penis. The incident occurred behind the closed and locked door to the master bedroom of her grandmother's house. Her Aunt Sarah was in the house at the time and came to the door when she cried out. Appellant then turned on the TV and ran to the bathroom. Sarah testified at trial. She recalled a time when she heard B.W. cry out and when she went to investigate, B.W. ran out of the master bedroom. Appellant was lying on the bed watching TV. Sarah believed that B.W. was about 4 years old at the time. B.W. testified that Appellant did this to her a total of nine times. These events occurred between the time she was five and seven years old. Of the nine times, B.W. described only three of the penile-anal penetrations with any detail. Aside from the time Sarah was in the house, B.W. testified to a similar incident at her grandmother's house. She recalled the type and color of clothing she was wearing, as well as some of the clothing that Appellant had on. And B.W. testified to a third anal penetration when she went to Norma's house, who was Appellant's new

3

girlfriend and fiancé after he broke up with B.W.'s grandmother. B.W. went there to help make Easter eggs. While there, Appellant took her to a room to watch TV. He locked door and told her to pull down her pants. When she refused, he pulled them down and anally penetrated her.

B.W. testified to three other specific events involving other sex acts, or attempted sex acts. Once, Appellant took her to a shed behind her grandmother's house, pulled down her shorts, and had her get on her hands and knees. He then tried to make a dog penetrate her anus. She felt the belly of the dog pressing up against her, but the dog would not cooperate, and Appellant stopped when he thought he heard someone outside. Another time, and also while at the grandmother's house, she went to the refrigerator to look for a popsicle. She found none, but soon saw Appellant lying on the bed with his pants undone. He asked her to use his exposed penis as a popsicle, but she refused. While also in the master bedroom at the grandmother's house, Appellant once closed and locked the door, and then pulled out a sex toy shaped like a fake penis and told her to use it. She again refused. Finally, without describing any circumstances other than it was in her grandmother's bedroom, she testified that Appellant put his tongue on her vagina.

The State presented some details of the several indicted crimes through three outcry witnesses--B.W.'s Aunts Melinda and Jennifer, and the forensic interviewer, Victoria Smith. As to each, the trial court held a hearing outside the presence of the jury to determine whether the testimony qualified as an admissible outcry statement under TEX.CODE CRIM.PROC.ANN. art. 38.072. Because Appellant's sole issue on appeal involves their testimony, we set it out more detail.

### Aunt Melinda

Melinda testified as the State's first called outcry witness. B.W. lived with Melinda in Florida in May of 2013. At that time, B.W. initiated a conversation about where babies come

4

from. By the end of the conversation, B.W. had described to Melinda an event when Appellant was watching her one day, took her underwear down, and anally penetrated her. B.W. also told Melinda of the time when Appellant took her to shed and had the dog do same thing. Upon hearing this, Melinda quickly contacted Florida authorities who set up a forensic interview of B.W. The trial court allowed Melinda to testify to B.W.'s hearsay statements about these two specific events. Appellant does not challenge that ruling, but rather claims Melinda was the first to hear the outcry and the other outcry witnesses in part duplicated her testimony.

### Victoria Smith

Ms. Smith works as a forensic interviewer for the Kimberly Center for Child Protection in Florida. She interviewed B.W. on June 12, 2013, when B.W. was nine years old. B.W. described three instances of penile-anal penetration in the interview. Ms. Smith had asked B.W. to describe the "last" time it happened. In response, B.W. then explained that her mother had asked Appellant to watch her. She was at Norma's house. She indicated that they had dyed Easter eggs, and stated that while in his room and on his bed, he anally penetrated her with his penis, moving back and forth.

Ms. Smith asked B.W. to describe the time she that she "remembered the most." In response, B.W. disclosed an anal penetration incident at her grandmother's house while watching T.V. B.W. said that he "used too much force" and it had hurt her. She told Appellant to stop and he wouldn't and she began to cry.

B.W. also described to Ms. Smith the event with the dog, and provided much more detail than B.W. shared with Aunt Melinda.

Over Appellant's objection that Veronica Smith would testify to the same events as Aunt Melinda, the trial court allowed Victoria Smith to testify to only two events: the "Easter egg"

5

incident and the time B.W. "remembered the most." Victoria Smith testified to B.W.'s descriptions of only those two events at trial.

## Aunt Jennifer

B.W. began living with her Aunt Jennifer in June 3013. After developing some rapport with the child, B.W. in October 2014 opened-up to Jennifer in a two-hour conversation where she disclosed additional events. B.W. told Jennifer of six specific events, all occurring when she was between the ages of four and seven:

1. The "first" incident occurred when B.W. was four years old. While at her grandmother's house, Appellant told her that if "she would do this for him that he would buy her anything that she wanted[.]" He then took her into the bedroom, removed her pants and underwear, bent her over the bed facedown and penetrated her anus with his penis. After the incident he took her to Walmart and bought her Play-Doh, a Play-Doh molder, and ice cream.

2. In another incident, Appellant while in the grandmother's bedroom, asked B.W. to use several sex toys, shaped like a penis.

3. B.W. described the time she was looking for a popsicle and Appellant asked B.W. to use his exposed penis as a popsicle.

4. Next, B.W. described a time when Appellant took B.W. to his parent's home and took her up to his childhood bedroom. B.W. described the unique furnishings in the room. Appellant then pulled her pants and underwear down, bent her over the bed, and penetrated her anally with his penis.

5. On another occasion, B.W. said that her mom had picked her up on a half-day at school, and dropped her off at Appellant's new girlfriend's house. Other than Appellant, no one else was home, and while watching TV, he stated that "TV time was over." Again, he removed her pants

6

and underwear and penetrated her anally with his penis.

6. Finally, she told her great aunt Jennifer about the time Appellant used his tongue on B.W.'s vagina.

The trial court ruled it would permit all the statements, except the one concerning the sex toys. Aunt Jennifer then testified before the jury to the (1) "first" event when Appellant rewarded B.W. with Play-Doh, (2) the popsicle incident, (3) the penile-anal penetration in Appellant's childhood bedroom, (4) the penile-anal penetration following the half-day from school at Appellant's new girlfriends house, and (5) the time Appellant used his tongue on B.W.'s vagina.

The jury found Appellant guilty on four counts of aggravated sexual assault by penile-anal penetration, guilty of two counts of attempted aggravated sexual assault of a child, and guilty on two counts of indecency with a child (one by contact and one by exposure). Following the punishment phase of the trial, and based on the jury's punishment verdicts, the trial court sentenced Appellant to four concurrent 99-year sentences on each of the aggravated sexual assaults of a child; 20 years on each of the two attempted aggravated sexual assaults of a child; and 10 and 20 years respectively on the indecency charges, along with a $5,000 fine. Appellant brings a single issue on appeal claiming that both events recounted by Victoria Smith are the same events that Aunt Melinda testified about. He also claims that two of the events described by Aunt Jennifer are duplicative of the other outcry testimony. He claims that absent the duplicative testimony, a reasonable jury could have found that the State failed to meet its burden of proof on the charged offenses. Appellant punctuates this point, claiming that B.W. herself only testified to three aggravated sexual assaults, yet the jury convicted him on four counts of aggravated sexual assault.

## APPLICABLE LAW AND STANDARD OF REVIEW

Article 38.072 of the Texas Code of Criminal Procedure creates a statutory exception to the hearsay rule. It allows the *first* adult to whom a child makes a statement describing a sexual assault to testify to the child's outcry, if the statute's provisions are met. *See* TEX.CODE CRIM.PROC.ANN. art. 38.072.[2] A proper outcry witness, however, is not the first adult to whom the child made any outcry, but instead the first adult to whom the child described the abuse in some discernible way. *Garcia v. State*, 792 S.W.2d 88, 91 (Tex.Crim.App. 1990); *In re C.E.S.*, 400 S.W.3d 187, 192 (Tex.App.--El Paso 2013, no pet.); s*ee Reyes v. State*, 274 S.W.3d 724, 727 (Tex.App.--San Antonio 2008, pet. ref'd)(stating that the proper outcry witness is the first adult to whom the child shares the "how, when, and where" of the assault). Outcry testimony is event-specific and not person-specific, meaning that multiple outcry witnesses may testify when the outcry statements are about different events. *Lopez v. State*, 343 S.W.3d 137, 140 (Tex.Crim.App. 2011); *In re C.E.S.*, 400 S.W.3d at 192. Nonetheless, the statute does not permit repetitious testimony about the same event--there may be only one outcry witness per event. *Lopez*, 343 S.W.3d at 140.

A trial court has "broad discretion" in admitting outcry witness testimony. *Garcia*, 792 S.W.2d at 92; *Buentello v. State*, 512 S.W.3d 508, 516 (Tex.App.--Houston [1st Dist.] 2016, pet. ref'd). Accordingly, we review a trial court's designation of an outcry witness under an abuse-of-discretion standard, and we will not disturb the exercise of that discretion unless the record establishes a clear abuse of discretion. *Garcia,* 792 S.W.2d at 92; *In re C.E.S.*, 400 S.W.3d at 191.

---

[2] Article 38.072 applies to out-of-court statements that: (1) describe the alleged offense; (2) are made by the child; and (3) are made to the first person, eighteen years of age or older, other than the defendant, to whom the child made a statement about the offense. *Id.* Article 38.072 further requires that: (1) on or before the fourteenth day before proceedings begin, the adverse party is (a) notified of the State's intent to offer the outcry statement, (b) provided the name of the outcry witness the State intends to offer, and (c) provided a written summary of the statement; (2) the trial court holds a hearing to determine whether the statement is reliable; and (3) the child testifies or is available to testify. *Id.*

A trial court abuses its discretion when its ruling is outside the zone of reasonable disagreement. *See Garcia*, 792 S.W.2d at 91-92; *In re C.E.S.*, 400 S.W.3d at 191. As the Texas Court of Criminal Appeals has reminded us, different trial judges may "reach different conclusions in different trials on substantially similar facts without abuse of discretion." *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex.Crim.App. 2007)(stated in the context of a trial court's discretion in deciding Rule 403 objection).

## DISCUSSION

Appellant contends that the statement to Aunt Melinda and to Veronica Smith "likely describe the same incident." He draws this conclusion because (1) both involve instances when Appellant was babysitting, (2) both involve penile-anal penetration, and (3) in both instances Appellant asked B.W. to keep it a secret. Next, Appellant contends that two of the events described to Aunt Jennifer are repetitious of events already testified to by Aunt Melinda and Veronica Smith. We disagree.

### No Abuse of Discretion

Aunt Melinda described an aggravated sexual assault in the grandmother's bedroom and the attempted aggravated sexual assault with the dog. Veronica Smith testified to two events--one at Appellant's girlfriend's house when B.W. was dying Easter eggs, and the one time that B.W. "recalled the most." The Easter egg event was at a different location than that described to Aunt Melinda, and was clearly different. The time that B.W. "recalled the most" could conceivably be the same penile-anal penetration event that Aunt Melinda testified about, but it could also be a different event. B.W. testified that there were nine such incidents. They shared the common characteristics of Appellant babysitting the child, how he positioned the child on a bed, and later his request that she keep it a secret. The time B.W. recalled the most had the added characteristic

9

of how Appellant was moving back and forth, and the degree of pain he inflicted. The trial court was in the zone of reasonable disagreement as to whether this was a distinct event.

For much the same reason, the trial court did not err in allowing Aunt Jennifer's testimony. Appellant only challenges her recitation of two events--the description of the "first" time it happened and one time at the girlfriend's home when Appellant said, "TV time is over." This latter event is clearly different from that described by Aunt Melinda in that it was at a different location. The latter event shares the same location as one Veronica Smith described with the Easter eggs, but it also has a significant difference. On this occasion, B.W. said no one else was home. When decorating the Easter eggs, both Norma and her son were present at the house. The "first" event also contained unique identifiers which might set it aside in the mind of a child as a distinct event (the subsequent trip to Wal-Mart and the description of the toy he purchased for her). The trial court's decision thus falls squarely within the zone of reasonable disagreement, and it did not abuse its discretion in allowing testimony of these events.

### Not Harmful Error

And while it is theoretically possible that one of these events could have overlapped with another, Appellant has failed to show that any error would be reversible. As non-constitutional error, we must disregard any error that does not affect Appellant's substantial rights. *See* TEX.R.APP.P. 44.2(b); *Garcia v. State*, 126 S.W.3d 921, 927 (Tex.Crim.App. 2004). An error is harmless if we are reasonably assured that the error did not influence the verdict or had only a slight effect. *Id.* Likewise, the improper admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial. *See Mayes v. State*, 816 S.W.2d 79, 88 (Tex.Crim.App. 1991). In making a harm analysis, we consider the entire record, including: (1) the character of the alleged error and how it might be considered with other

10

evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of evidence. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App. 2002).

On our record, B.W. testified that Appellant penetrated her anus nine times. She described three of the events with some detail. Two were at B.W.'s grandmother's house, and one at Norma's residence. She described graphic anatomical details that we need not repeat here, but which are consistent with the alleged aggravated sexual assault. Appellant never presented any compelling reason why B.W. would lie about these events. At trial, he questioned whether B.W.'s grandmother was angry at Appellant because of their break-up. Yet, he never showed that anger was communicated to, or affected B.W. At the time of the outcry, B.W. had been living away from the grandmother for about a year, and by the time of trial the grandmother had not seen B.W. in several years. Appellant's other defense theme challenged whether anything happened outside the grandmother's house. He presented some evidence from Norma who claimed B.W. was not at the house often, and when Norma was present, nothing could have happened. By the same token, a jury might have also concluded that Norma was not always present and could not exclude that something did occur.

On appeal, Appellant does not challenge the admissibility of Aunt Jennifer's recitation of a fourth event that occurred at a different location (Appellant's childhood home). For that matter, we doubt whether Appellant preserved an objection to any of the events Aunt Jennifer recounted. After the trial court indicated which of the events it would allow Aunt Jennifer to testify about, the trial court and defense counsel had the following exchange:

> DEFENSE COUNSEL: No. I have a problem with the whole thing. She's the third witness. She's the third outcry on this.
>
> THE COURT: I understand, Counsel; but this is on something totally different. And I've already made my ruling. Go ahead and state your objection.

11

> DEFENSE COUNSEL: Well, my objection, again, your Honor, is this is going beyond -- I don't believe that the evidence will outweigh any probative factor as far as being prejudicial to my client.

In general, to preserve a complaint for appellate review, a defendant must make a timely and specific objection to the trial court. TEX.R.APP.P. 33.1(a); *Lovill v. State*, 319 S.W.3d 687, 691-92 (Tex.Crim.App. 2009). An objection stating one legal basis cannot support a different legal theory on appeal. *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex.Crim.App. 2004). And regarding challenges to outcry testimony, "[m]aking specific objections to each act or event is particularly important [for] numerous separate and discrete acts of sexual assault, each of which could have a separate outcry witness." *Eldred v. State*, 431 S.W.3d 177, 185 (Tex.App.--Texarkana 2014, pet. ref'd)(holding defendant failed to preserve error by objecting to all incidents testified to by outcry witness, when some were proper); *see also Sonnier v. State*, 913 S.W.2d 511, 518 (Tex.Crim.App. 1995)("When an exhibit contains both admissible and inadmissible evidence, the objection must specifically refer to the challenged material to apprise the trial court of the exact objection.").

Appellant's objection to Aunt Jennifer's testimony stumbles on these principles. He objected to all her testimony, when some was clearly proper. He never explained which of the specific events overlapped with the others, or why. Even at that, his trial objection is stated more as a TEX.R.EVID. 403 complaint, rather than as a hearsay objection. Failing a proper objection to Aunt Jennifer's testimony, the record contains B.W.'s three specifically described accounts of an aggravated sexual assault, and three others from Aunt Jennifer. A jury had sufficient evidence, even aside from the other challenged outcry statements, to conclude that Appellant committed the four acts of sexual assault of a child that he was charged with. And for each of the four aggravated sexual assaults that Appellant was convicted on, he was sentenced to identical terms that all ran concurrently.

12

On appeal, Appellant also does not challenge the admissibility of the evidence that supported the two attempted sexual assaults, and two indecency counts. That evidence included the outcry witnesses' description of an attempted sexual assault utilizing a canine, and an attempt to have B.W. perform oral sex on Appellant. The evidence also included Appellant exposing himself to B.W. and performing oral sex on her. In addition, the jury heard evidence that Appellant created a peephole into a bathroom so that he could observe two other teenage females bathing, and placed sex toys in the bathtub hoping that they would use them. While these events do not directly evidence any of the four aggravated sexual assaults at issue, they lend substantial credence to B.W.'s account of those assaults.

Nor did the State's attorneys emphasize the outcry witnesses evidence in closing. In fact, they never mentioned it at all. A fair reading of the closing argument shows the State referred to B.W.'s own testimony, and not that of the outcry witnesses.

In summary, B.W. testified without objection about three of the incidents in the same manner as the outcry witnesses. *See In re C.E.S.*, 400 S.W.3d at 192; *Nino v. State*, 223 S.W.3d 749, 754 (Tex.App.--Houston [14th Dist.] 2007, no pet.)(when substantially same evidence admitted through victim and proper outcry witness, improper outcry witness's testimony was harmless); *Duncan v. State,* 95 S.W.3d 669, 672 (Tex.App.--Houston [1st Dist.] 2002, pet. ref'd)(trial court's admission of outcry witness's testimony was harmless where the same facts were admitted into evidence without objection). Aunt Jennifer testified about a fourth aggravated sexual assault without any objection. She testified to two additional aggravated sexual assaults over a deficient objection. Jennifer Smith testified to at least one additional unique aggravated sexual assault. Considering the entire record, even if we assume that error occurred in this case, we have a reasonable assurance that any error was harmless.

13

## CONCLUSION

We overrule Appellant's single issue on appeal and affirm the judgment of conviction below.

September 26, 2018

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

14