**Opinion issued June 27, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00147-CR

————————————

**SANKET SHUKLA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1457192**

---

## MEMORANDUM OPINION

Appellant, Sanket Shukla, was found guilty by a jury of the offense of aggravated sexual assault of a child.[1] The jury assessed his punishment at 59 years

---

[1] *See* TEX. PENAL CODE § 22.021(a)(1)(B)(iii), (a)(2)(B).

in prison. In three issues, Appellant contends that (1) the evidence was not sufficient to support the judgment of conviction, (2) the trial court abused its discretion when it denied his motion to suppress his statement, and (3) the trial court abused its discretion in admitting evidence of an extraneous offense.

We affirm.

## Background

On February 5, 2015, eight-year-old "Ivey" [2] came home after school to her family's apartment to find no one there. Normally, one of her parents would be at home, but that day Ivey's mother had to work late, and her father needed to pick up Ivey's little brother from daycare. Ivey's parents had told her to stay in the apartment, but she decided to go outside and ride her bike with a friend.

When Ivey was putting her bike away, a man, later identified as Appellant, approached Ivey in his car. Appellant asked Ivey why she was outside. Ivey recognized Appellant as another tenant who lived in the same hallway as her family. Ivey had met Appellant one other time when he had introduced himself to her when she was throwing away the trash.

Appellant asked Ivey if she wanted to call her parents, and she said that she did. Ivey used Appellant's cell phone to call her father, but he did not answer. Even

---

[2]    Ivey is a pseudonym.

2

though Ivey knew that her mother was not allowed to talk on the phone while she was at work, Ivey also called her mother.

Nearby, a group of people were engaged in an altercation, yelling and screaming at one another. Appellant told Ivey, "It's not good for people to fight." Appellant took Ivey to the apartment complex's leasing office. Appellant asked B. Silberg, an administrative assistant at the apartment complex, to call the police because people were fighting. Silberg told Appellant to call the police, and he did. Appellant then told Silberg that he was taking Ivey to her father. Silberg saw Appellant take Ivey into the building where Appellant and Ivey's family lived. Silberg thought Appellant was holding Ivey's hand.

Appellant did not take Ivey to her apartment. Instead, Appellant took Ivey to his apartment. Once inside, Appellant locked the front door with a key. Appellant then told Ivey to sit on his bed. He asked her if she wanted to take a shower, and she said no. Appellant took off Ivey's shoes and began massaging her legs. Appellant told Ivey to get up, and he pulled the covers back on the bed. He told her to lie down, and he pulled the covers over her.

Ivey was wearing her school clothes: a skirt and a top. Appellant took off Ivey's underwear but left on her other clothing. Appellant took off his pants and his shirt but left on his underwear, which were boxer shorts. Appellant pulled the covers off Ivey and laid on top of her. Ivey later testified that Appellant "put[] his private

3

part into mine on the outside." Ivey clarified during her testimony that by Appellant's "private part" she meant his penis and by her "private part" she meant her vagina. She said that she knew it was Appellant's private part that was touching her private part because she could see both his hands next to the sides of her head. When asked whether Appellant's private part was only on the outside of her private part or was it also inside her private part, Ivey testified, "It was both. How I knew is because I [could] feel it inside and then I feel it out." Ivey also said it hurt her.

Ivey testified that Appellant laid on top of her for about 10 seconds. He then got off and asked her to sit on his lap. She said that her underwear was still off, and Appellant was still wearing only his underwear. Appellant again said to her that "it wasn't good for people to fight."

Ivey asked Appellant if she could get off his lap, and he said yes. Ivey was crying, and Appellant unlocked the door. Ivey grabbed her shoes and left Appellant's apartment. Ivey went straight to her apartment and unlocked the door. She saw signs that her dad was home. Ivey's father had gotten home and discovered that Ivey was not there. He was worried and had gone to look for her. When she found her dad, Ivey was crying. She told him that a neighbor had gotten on top of her and touched her private part. Ivey's dad called the police.

Ivey took her dad to Appellant's door, and her dad knocked. Appellant answered the door, and Ivey's dad confronted him. Appellant indicated that he did

4

not know what Ivey's dad was talking about. Appellant tried to leave, saying that he was going to the gym. Ivey's dad told Appellant he could not leave before the police arrived. Ivey's dad stood in front of Appellant, preventing him from leaving.

Officer J. Doguim of the Houston Police Department arrived on the scene. He spoke with Ivey, who told him that Appellant had touched her private parts with his private part.

Officer Doguim handcuffed Appellant and informed him that he was being detained for a sexual assault investigation. Officer Doguim placed Appellant in the back seat of his police car. Appellant told Officer Doguim that he had seen Ivey that day in the leasing office. Appellant said that he was in the leasing office to report that people were fighting in the apartment complex. He said that Ivey walked in to the office while he was there. Appellant indicated that he tried to assist her in finding her parents. Appellant told Officer Doguim that Ivey's parents should have watched her better and that the police should investigate that.

Appellant signed a consent form, permitting the police to search his apartment. During the search, Officer Doguim collected the linens from Appellant's bed and his clothing from the bedroom floor.

Appellant was transported to the central jail. He was placed on a 24-hour hold, pending a sexual-assault examination of Ivey that evening and a forensic interview of Ivey the following morning at the Children's Assessment Center.

Appellant spent the night in jail. He was questioned by police and gave an audio-recorded statement. Before the questioning began, Appellant was informed of his *Miranda*[3] rights. During the questioning, Appellant requested an attorney, and the questioning stopped.

Appellant was charged with the offense of aggravated sexual assault of a child under 14 years of age. The indictment charged that Appellant had "intentionally and knowingly cause[d] the sexual organ of [Ivey], a person younger than fourteen years of age, to contact the sexual organ of [Appellant]."

Appellant filed a motion to suppress in which he requested the trial court to suppress "any and all confessions and statements" taken from him. He alleged that his statements to the police were "illegal and tainted by [his] illegal and unlawful detention and arrest." After a hearing, the trial court denied the motion.

Before trial, the State filed a notice of intent to use evidence of prior convictions and extraneous offenses. One of the extraneous offenses was indecent exposure, involving an eight-year-old girl. The State averred that it intended to introduce evidence at trial showing that, on July 10, 2016, Appellant had "intentionally and knowingly, with intent to arouse and gratify [his] sexual desire, intentionally and knowingly expose[d] his genitals" to K.B, a child who was under 17 years of age. The trial court conducted hearings, both before and during trial,

---

[3]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

regarding the admission of evidence of the indecent exposure offense. The trial court determined that the evidence could be admitted.

The case was tried to a jury. Besides Ivey, the State offered the testimony of Ivey's father, her aunt, Silberg, and the nurse who conducted Ivey's sexual assault examination.

The jury also heard testimony of K.B. and her mother, Arsheena, regarding the extraneous indecent exposure offense. In sum, their combined testimony showed that, in July 2016, eight-year-old K.B. and her brother were riding their scooters on the sidewalk in front of their apartment. Appellant also lived in the apartment complex. Appellant approached K.B. and asked her to race him but told her brother to go in a different direction. K.B. went with Appellant, and they ended up at Appellant's apartment. Once in the apartment, Appellant exposed his penis to K.B. and tried to put his penis in her mouth. K.B. ran out the front door.

In her testimony, Arsheena said that K.B. and her brother were riding their scooters outside in front of their apartment. She was frequently checking on the children when she noticed K.B. was gone. Arsheena went to look for K.B. She soon saw K.B. running toward her, dragging her scooter. Arsheena testified that K.B. was crying, yelling, and screaming, saying that a man had tried to make "her suck his penis."

7

Arsheena called 9-1-1 on her cell phone while walking with K.B. toward Appellant's apartment. Before they got to his apartment, Appellant approached them on the path by the apartment complex's pool. K.B. yelled "there's the man, that's him, that's him, mom." Appellant started yelling at K.B., saying she was lying. Appellant tried to explain what had happened, saying that he had run into K.B. in the laundry room and scared her. Arsheena told Appellant to get away from them and took a picture of Appellant with her cell phone during the interaction.

One week later, the police separately showed K.B. and Arsheena a photo-lineup with six photos. K.B. could not identify Appellant, but Arsheena picked Appellant's photo out as the man involved in the incident with her daughter. At trial, K.B. could not identify Appellant in the courtroom as the man who had exposed himself to her. Arsheena made an in-court identification of Appellant as the man she photographed with her cell phone at the apartment complex after K.B. identified him to her as the man who had exposed his penis.

The defense did not call any witnesses. The jury found Appellant guilty of the offense of aggravated sexual assault of Ivey. The jury assessed punishment at 59 years in prison. This appeal followed.

**Sufficiency of the Evidence**

In his first issue, Appellant contends that the evidence was insufficient to support the judgment of conviction.

8

## A. Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under a single standard of review. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). This standard of review is the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

Pursuant to the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *In re Winship*, 397 U.S. 358, 361 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320; *Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to

draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326.

In our review of the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

**B.    Analysis**

*1.    Contact of Ivey's sexual organ by Appellant's sexual organ*

To prove Appellant was guilty of the offense of aggravated sexual assault of a child, the State needed to show that Appellant intentionally or knowingly caused the sexual organ of K.B., a child younger than 14 years of age, to contact Appellant's sexual organ. *See* TEX. PENAL CODE § 22.021(a)(1)(B)(iii), (a)(2)(B). Appellant contends that "[n]o rational factfinder could have concluded that appellant had sexual contact with [Ivey] by causing her sexual organ to contact his own sexual

organ" because there was "[a]bsolutely no evidence" that Appellant "ever touched [Ivey's] sexual organ" except through his clothing. Appellant avers that there was no evidence of contact between his and Ivey's sexual organs because Ivey testified that Appellant "wore his boxer brief underwear and touched her sexual organ with his sexual organ through his clothing." Appellant intimates that the evidence is insufficient to support his conviction because it did not show skin-to-skin contact between his sexual organ and Ivey's sexual organ.

Ivey testified that, when she went into Appellant's apartment, she was wearing her school clothes, a skirt and a top. Appellant told Ivey to lay down on his bed. She said that Appellant took off her underwear but left on her other clothing. Appellant took off his pants and his shirt but left on his underwear, which were boxer shorts. Appellant pulled the covers off Ivey and laid on top of her. The State then asked what happened next. Ivey provided the following testimony:

> A. And then he goes on top of me. I don't know if he had his hands up or down, but I just knew I couldn't get out. So he goes on top of me. And he, um—I don't know if his underwear were on or off during—he was putting his private part into mine on the outside.
>
> Q. Okay. All right. So how were you able to tell it was his private part?
>
> A. Because that's the only thing he was touching me with.
>
> Q. All right. Could you see his hands when this was happening?
>
> A. Yes.
>
> Q. Where were his hands?

A. In front of me just next to my head . . .

. . . .

Q. Okay. And do you remember what that felt like—so you said he—
   you felt his private part. Where did you feel his private part?

A. On my private part.

Q. What did that feel like?

A. It hurt. And it felt weird 'cause this is the first time this ever
   happened to me.

. . . .

Q. All right. And could you tell whether it was just on top of your
   private or can you—could you tell if it was inside of your
   private?

A. It was both. How I knew is because I can feel it inside and then I feel
   it out.

We are mindful that factfinders are free to use their common sense and apply
common knowledge, observations, and experience gained in the ordinary affairs of
life when making inferences that may reasonably be drawn from the evidence.
*Boston v. State*, 373 S.W.3d 832, 837 (Tex. App.—Austin 2012), *aff'd*, 410 S.W.3d
321 (Tex. Crim. App. 2013); *see Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—
Houston [14th Dist.] 2006, pet. ref'd). Ivey testified that Appellant was only wearing
boxer shorts and that she felt Appellant's penis inside her vagina. It would be within
the common knowledge of the jurors that boxer shorts have a fly and an elastic waist
band, each of which allows for the exposure of a penis outside the boxer shorts

12

without removing the shorts. From Ivey's testimony and their common knowledge, the jurors could have reasonably inferred that there was skin-to-skin contact between Appellant's sexual organ and Ivey's sexual organ.

We do not suggest that skin-to-skin contact is required for "contact" as that term is used in the context of the offense of aggravated sexual assault of a child by contact. To the contrary, courts, including this Court, have held that "contact" in this context includes contact through clothing. *See IslasMartinez v. State*, 452 S.W.3d 874, 879–80 (Tex. App.—Dallas 2014, pet. ref'd); *Jones v. State*, Nos. 01–98–01400–CR & 01–00–00489–CR, 2000 WL 675714, *2 (Tex. App.—Houston [1st Dist.] May 25, 2000, pet. ref'd) (not designated for publication); *Caldwell v. State*, No. 03–96–00603–CR, 1998 WL 10280, *2 (Tex. App.—Austin Jan. 15, 1998, no pet.) (not designated for publication). Thus, the evidence showed contact between Appellant's sexual organ and K.B.'s sexual organ even if Appellant's penis was covered by the cloth of his underwear while he touched it to the bare skin of Ivey's sexual organ and inserted it into her vagina. *See IslasMartinez*, 452 S.W.3d at 879–80; *Jones*, 2000 WL 675714, at *2.

    2.    *Jurors' role: weighing evidence and resolving evidentiary conflicts*

Appellant claims that no rational juror could have believed Ivey's claim that Appellant sexually assaulted her because some of the State's evidence was either inconclusive or contained discrepancies and inconsistencies. Specifically, Appellant points to the following:

- The nurse who performed Ivey's sexual assault examination testified that the examination showed that Ivey had an abrasion on her labia minora. The nurse stated that the abrasion was consistent with the events reported by Ivey involving Appellant but also could have been caused by some other blunt force trauma such as Ivey's fingernail scratching her labia minora when she wiped herself.

- Ivey testified that, after they left the leasing office, Appellant took her by the wrist and dragged her past her family's apartment door on the way to his apartment. She said that, as she passed her door, she was "freaking out" and crying. Ivey testified that she asked Appellant if she could go to her apartment, but Appellant did not respond and kept walking to his apartment. Appellant points to evidence indicating that, after leaving the leasing office, Appellant and Ivey did not walk past her apartment door but would have reached his apartment first.

- The testimony of Ivey, her father, and her aunt showed a timeline for when the incident occurred that was about one-and-a-half hours earlier than what other evidence showed.

- Ivey testified that the cover on Appellant's bed was red when other evidence showed it was brown. Ivey testified that Appellant was wearing a plaid shirt when the evidence showed that the shirt collected by Officer Doguim from Appellant's bedroom floor was striped. Ivey stated that Appellant had driven up to her when she was on her bike in a white or light gray car, but evidence showed Appellant's car was dark blue.

- Ivey's testimony indicated that, when she went into the leasing office with Appellant, she was not comfortable with Appellant, and she thought at the time she was making a bad decision going with him.

Silberg, the administrative assistant in the office, testified that, when Ivey was in the leasing office with Appellant, Ivey was friendly, quiet, and did not seem alarmed.

- Ivey could not identify Appellant in the courtroom.

Appellant also claimed that Ivey had reason to lie about the sexual assault. She was not supposed to leave the apartment while her parents were not home. Appellant theorizes that Ivey lied to distract from her breaking her parents' rules.

A child-sexual-assault complainant's uncorroborated testimony, standing alone, is sufficient to support a defendant's conviction. *See* TEX. CODE CRIM. PROC. art. 38.07; *see also Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978) (holding victim's testimony of penetration by appellant, standing alone, was sufficient to support conviction); *Jensen v. State*, 66 S.W.3d 528, 534 (Tex. App.— Houston [14th Dist.] 2002, pet. ref'd) (stating testimony of victim, standing alone, was sufficient evidence). The State has no burden to produce physical or other corroborating evidence. *Jones v. State*, 428 S.W.3d 163, 169 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Thus, Ivey's testimony alone was enough to support the jury's guilty finding.

While the contradictory and inconsistent evidence raises questions of fact and credibility, the jury had the inherent authority to decide who and what to believe. *See Canfield v. State*, 429 S.W.3d 54 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Billy v. State*, 77 S.W.3d 427, 428 (Tex. App.—Dallas 2002, pet. ref'd). In

15

addition, appellate courts give wide latitude to a child complainant's testimony of sexual abuse. *Jones*, 428 S.W.3d at 169; *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi 2008, no pet.). A child's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult. *See Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990); *see also Buentello v. State*, 512 S.W.3d 508, 516 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (concluding that any alleged deficiencies in child victim's testimony—such as whether child told forensic investigator during her interview about penetration or disclosed additional aspects of assault at trial that she had not previously mentioned—did not diminish legal sufficiency of her direct trial testimony on issue).

By returning a guilty verdict, we must infer that the jury believed Ivey's testimony indicating that Appellant sexually assaulted her by placing his penis on the inside and outside of her vagina, and we defer to that determination. *See Laster*, 275 S.W.3d at 524–25. It is the exclusive role of the fact finder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences[.]" *Buentello*, 512 S.W.3d at 516 (quoting *Jackson*, 443 U.S. at 319). We may not "re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder." *Hernandez. v. State*, 268 S.W.3d 176, 179 (Tex. App.—Corpus Christi 2008, no pet.) (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.

16

Crim. App. 1999)). Even contradictory evidence in the record will not diminish the sufficiency of evidence that otherwise supports the jury's verdict. *Buentello*, 512 S.W.3d at 516. We disagree with Appellant that Ivey's testimony was so contradicted by other evidence that a reasonable fact finder could not have believed her testimony regarding Appellant's act of sexually assaulting her.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational fact finder could have found, beyond a reasonable doubt, each element necessary to support the finding that Appellant committed the offense of aggravated sexual assault as charged in the indictment. *See Jackson*, 443 U.S. at 318–19; *Williams*, 235 S.W.3d at 750. Accordingly, we hold that the evidence was sufficient to support the judgment of conviction.

We overrule Appellant's first issue.

**Extraneous-Offense Evidence**

In his third issue, Appellant contends that the trial court erred by admitting extraneous-offense evidence showing that, in July 2016, Appellant had exposed his penis to eight-year-old K.B. and tried to make her perform oral sex on him. The trial court conducted two hearings to determine whether to admit the testimony. During the hearings, K.B. and her mother, Arsheena, testified.

K.B. testified that she was riding her scooter in her apartment complex. Appellant approached her and asked her to race. They ended up at Appellant's

17

apartment. Once inside, K.B. testified that Appellant exposed his penis to her and tried to make her put his penis in her mouth.

K.B. ran away. Arsheena testified that K.B. ran up to her crying and yelling that a man had tried to make her suck his penis. K.B. started to lead Arsheena to Appellant's apartment when they ran into Appellant on the path. Appellant said that K.B. was lying. He stated that he had run into her in the laundry room and scared her. Arsheena called the police and took a photo of Appellant with her cell phone. In court, Arsheena identified Appellant as the man who K.B. had identified at the time of the incident, but K.B. was not able to identify Appellant in court.

The trial court ruled that evidence of the extraneous offense involving K.B. would be admitted. K.B., Arsheena, and an investigating police officer testified at trial.

## A. Legal Principles

A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). If the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and we will uphold the trial court's ruling. *Id.*

When a defendant is tried for certain sex offenses against children, including aggravated sexual assault, the State may introduce evidence that the defendant has

18

committed a separate sex offense against another child. TEX. CODE CRIM. PROC. art. 38.37, § 2(b); *see Caston v. State*, 549 S.W.3d 601, 608 (Tex. App.—Houston [1st Dist.] 2017, no pet.). This evidence is admissible for any relevant purpose, including as proof of the defendant's character and propensity to act in conformity with his character. TEX. CODE CRIM. PROC. art. 38.37, § 2(b); *Jacobs v. State*, 560 S.W.3d 205, 207 (Tex. Crim. App. 2018). Before admitting "evidence that the defendant has committed a separate offense" of a sexual nature against a child, Article 38.37 requires the trial court to conduct a hearing to determine that the evidence sought to be admitted will be adequate to support a jury finding that the defendant committed the separate offense beyond a reasonable doubt. TEX. CODE CRIM. PROC. art. 38.37, §§ 2(b), 2-a.

## B.    Analysis

Appellant contends that the testimony of K.B. and Arsheena, offered at the Article 38.37 hearings, was not sufficient to establish, beyond a reasonable doubt, that Appellant had committed the offense of indecent exposure. Specifically, Appellant asserts that the trial court abused its discretion in admitting K.B.'s and Arsheena's testimony because "no rational factfinder could have found [him] guilty of exposing himself" to K.B. based on K.B.'s and Arsheena's testimony at the hearings. Appellant asserts that Arsheena's "limited exposure to [him at the time of the incident] was wholly insufficient to support her identification," and "K.B. was

19

completely unable to identify" him in court. In other words, Appellant contends that the testimony was insufficient to identify him as the man K.B. claimed had exposed himself to her.

Arsheena testified that, on the day of the incident, Appellant was the man who K.B. identified in the apartment complex as the person who had exposed his penis to her and tried to make her put it in her mouth. The testimony indicated that the offense had just happened to K.B. when she pointed Appellant out to Arsheena. Arsheena said that K.B. came running up to her crying, screaming, and yelling about what had just happened. They started walking and ran into Appellant. K.B. and Arsheena both testified that K.B. told Arsheena that the man they encountered was the man who had just exposed himself to her. Appellant did not deny that he been with K.B., instead, he said that she was lying and that he had scared her in the laundry room. Arsheena indicated that she was face to face with Appellant when they spoke. Arsheena testified that she took a picture of Appellant with her cell phone. Arsheena identified Appellant in court as the man K.B. had identified as the person who had exposed himself to her. Arsheena's testimony, in conjunction with K.B.'s testimony, provides support for Arsheena's identification of Appellant.

In short, the admissibility of K.B.'s and Arsheena's testimony turned on the trial court's assessment of their credibility and the weight to be given the evidence. We cannot say the trial court abused its discretion in determining that K.B.'s and

Arsheena's testimony would support a rational jury's determination beyond a reasonable doubt that Appellant committed the extraneous offense of indecent exposure against K.B. *See Ryder v. State*, 514 S.W.3d 391, 399 (Tex. App.—Amarillo 2017, pet. ref'd) (holding that admissibility of witness's testimony about extraneous offense did not violate Article 38.37 because admissibility of testimony turned on trial court's assessment of witness's credibility and weight to be given evidence).

We overrule Appellant's third issue.

## Suppression of Evidence

In his second issue, Appellant contends that the trial court abused its discretion when it did not suppress statements he made while handcuffed in the backseat of Officer Doguim's police car.

## A. Appellant's Motion to Suppress and Suppression Hearing

Appellant filed a motion to suppress in which he requested the trial court to suppress "any and all confessions and statements" taken from him. He alleged that his statements to the police were "illegal and tainted by [his] illegal and unlawful detention and arrest," citing various constitutional and statutory provisions.

At the motion to suppress hearing, Officer Doguim testified that, when he arrived to investigate the sexual assault of Ivey, there were already police officers on the scene. He spoke with Ivey, who identified Appellant as the person who had

21

sexually assaulted her. Officer Doguim briefly spoke with Appellant to identify him and to confirm he was Ivey's neighbor. He then placed Appellant in handcuffs and put him in the backseat of his police car. Officer Doguim explained to Appellant that he was being detained for a sexual-assault investigation. Appellant consented to a search of his apartment, and Officer Doguim explained the consent-to-search form to Appellant. Officer Doguim told Appellant that he would be taken to the central jail and detained there until he spoke to an investigator.

Officer Doguim testified that he did not question Appellant about the sexual assault. However, he stated that Appellant made "several spontaneous utterances while in the back seat of my vehicle." When asked what those were, Officer Doguim testified, "[Appellant] had said that he—that the little girl, [Ivey] should not be— have been left alone. He said that the police department should look into why she was by herself, and then he continued, as I was not talking to him, continued to say that he felt that she should not be left alone." Officer Doguim stated that he transported Appellant to the central jail where he was placed on an investigative hold.

A. Flowers, an investigator with the Houston Police Department's sex crimes division, also testified at the motion to suppress hearing. She stated that Appellant was kept overnight at the jail because he was placed on an "investigative hold." Investigator Flowers indicated that the police wanted Ivey to undergo her sexual

22

assault examination and undergo a forensic interview before they interviewed Appellant.

After Appellant spent the night in jail, at around 9 a.m., Investigator Flowers read Appellant his *Miranda* rights, and Appellant agreed to be interviewed by police. The interview was audio-recorded. During the interview, Appellant requested an attorney and the interview stopped.

During the suppression hearing, Appellant asked Investigator Flowers whether an arrest warrant had been issued for Appellant before the interview and whether Appellant had been taken before a magistrate prior to the interview. She said that, before the interview, an arrest warrant had not been issued, and Appellant had not been taken before a magistrate.

The State argued that, "given the fact that the *Miranda* warnings were given and intentionally and knowingly and voluntarily waived," the audio-recorded statement should "com[e] into evidence and be[] played for the jury at trial."

Appellant responded,

Your Honor, there was no warrant for the defendant's arrest, and there doesn't appear to me to be an exception for a warrantless arrest as they have listed under Section 14 of the Code of Criminal Procedure, and the defendant was not taken before a magistrate without unnecessary delay even if there was an exception to the arrest without a warrant.

The interview is the result of this illegal arrest and the defendant not being taken before the magistrate, and we would ask the Court to not admit the warrant [sic] because it's not—it's not taken pursuant to a valid arrest of the defendant.

The State responded that Appellant was detained overnight on an investigative hold because the police officers wanted Ivey to undergo a forensic interview before they interviewed Appellant, so they would have information from Ivey's interview when they questioned Appellant. Ivey's forensic interview was not conducted until the morning after the incident occurred. The trial court asked the State, "But they felt the need to *Mirandize* the defendant just in an abundance of caution; is that what your argument is?" The State indicated that it was an appropriate procedure. Defense counsel responded,

> Judge, the defendant was clearly placed in handcuffs, placed in the back of a police car, removed to his home and held and arrested at the central jail, and interviewed at the central jail, where he had been held since at least 8:00 p.m., according to Officer Flowers. He was actually arrested and placed in the police car earlier than that. Using the word detained is a—he was arrested. He could not leave. He was in the back of a police car handcuffed. There is—what the State must show is that there's some exception to the warrant requirement.

The trial court asked the defense, "So the little girl's statement, as I understand the officer's testimony, about what happened and identifying him as the perpetrator would not be sufficient for an officer to make at least an investigative detention and place someone in custody for investigation?" The defense answered, "[It] might allow them to detain the defendant, without a warrant, but they held the defendant in jail for over 12 hours, until they interviewed him the next day, until they

completed other investigation. That surely goes . . . beyond a *Terry*[4] type temporary detention." The State again asserted that placing Appellant on an investigative hold was appropriate "to follow up both forensically and medically with the little girl to figure out what next steps needed to be made," given the nature of the allegations.

The Court then made its ruling on the motion to suppress as follows: "The motion to suppress is denied. The Court's going to make a finding that the defendant was properly *Mirandized*. The defendant acknowledged that he understood his rights and he voluntarily and intelligently waived his rights and gave a voluntary statement without any persuasion and/or compulsion, so the statement's admissible."

Even though the trial court ruled it was admissible, the State did not offer Appellant's audio-recorded statement into evidence at trial.

## C.    Analysis

On appeal, Appellant complains that the trial court did not suppress his statements—made while handcuffed in the backseat of Officer Doguim's police car—that Ivey should not have been left alone and that the police department "should look into why she was by herself." Appellant contends that these statements should have been suppressed because they were a product of an illegal arrest. In his brief, Appellant claims that Ivey's father "illegally arrested" him when he would not let Appellant leave his apartment until the police arrived. Appellant claims that Officer

---

[4]    *See Terry v. Ohio*, 392 U.S. 1 (1968).

Doguim then assumed the arrest by placing him in handcuffs and then placing him in the back of the police car. Appellant asserts that, as a result, his "statements that the police should have been focusing on the girl's parents for not supervising her were the product of an illegal arrest and should have been suppressed."

A defendant's assertion of grounds for suppression raised in an appellate court must comport with his articulated grounds for suppression in the trial court, or the grounds are not preserved. *See* TEX. R. APP. P. 33.1(a)(1); *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005); *see also Thornburg v. State*, No. 02-14-00453-CR, 2015 WL 4694094, at *8 (Tex. App.—Fort Worth Aug. 6, 2015, pet. ref'd) (mem. op., not designated for publication) ("Because Thornburg's motion to suppress and his argument at the suppression hearing centered on whether there was consent to search his apartment, he forfeited his complaint on appeal that the search was not justified by other exceptions to the warrant requirement, such as the plain-view doctrine and exigent circumstances.").

Appellant's written motion to suppress contained general assertions of constitutional and statutory violations, but nothing in the motion alerted the trial court to a complaint that Ivey's father had "illegally arrested" him. Nor was there any mention at the suppression hearing of the father's actions.

Also, as discussed in detail above, the subject matter of the suppression hearing was Appellant's in-jail audio-recorded statement made after he had spent

26

the night in jail, had been *Miranda*-ized, and had waived his rights. Nothing indicates that the trial court was appraised of any request by Appellant, seeking to suppress the remarks he made in the back of the police car. And, read in context, the trial court's ruling at the end of the hearing was only a determination that Appellant's in-jail statement was admissible.

We conclude that Appellant did not apprise the trial court of his complaint that Ivey's father illegally arrested him or his complaint that his remarks in the back of the police car should be suppressed.[5] Because Appellant's arguments on appeal do not comport with his trial-court complaint, they are not preserved. *See* TEX. R. APP. P. 33.1(a); *Swain*, 181 S.W.3d at 365; *see also Smith v. State*, 532 S.W.3d 839, 841 (Tex. App.—Amarillo 2017, no pet.) ("[T]he grounds [for suppression] urged below do not comport with those urged on appeal, and that effectively waives the latter as basis for reversal.").

We overrule Appellant's second issue.

**Conclusion**

We affirm the judgment of the trial court.

---

[5]     When Officer Doguim testified at trial about the remarks Appellant made in the police car's backseat, the defense made no objections to the testimony.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Do not publish. TEX. R. APP. P. 47.2(b).