**Opinion issued July 9, 2019**



In The

# Court of Appeals

For The

# First District of Texas

―――――――――――

## NO. 01-18-00332-CR

―――――――――――

**CRENSHANDA WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 4
Harris County, Texas
Trial Court Case No. 2114968**

---

## O P I N I O N

Crenshanda Williams was tried by a jury and convicted of one count of interference with an emergency request for assistance.[1] The trial court entered a judgment of conviction on the jury's verdict and sentenced Williams to one year in

---

[1]     *See* TEX. PENAL CODE § 42.062(a).

jail, probated for 18 months, and with stipulations that Williams pay a fee to Crime Stoppers, take a "Thinking for a Change" course, participate in a weekend work program, and write an apology letter to the City of Houston.

Williams appeals, contending that the trial court erred by denying her motion for an instructed verdict at the close of the State's evidence and that the evidence was insufficient to support her conviction. We affirm.

## Background

Williams worked as a "telecommunicator" at the Houston Emergency Center ("HEC"). C. Breed is a division manager with the HEC. She described the HEC as "the combined center where police 9-1-1 calls—police calls, fire, and ambulance calls are processed and dispatched." In her role, Breed trains telecommunicators, who are the individuals who receive the 9-1-1 calls from callers.

### Telecommunicator Training

Breed helped write the telecommunicator-training curriculum and helps update it from time to time. Prospective telecommunicators must pass a psychological exam, pass a drug test, and fill out a lengthy personal-history questionnaire. Immediately after hire, telecommunicator trainees receive two weeks of classroom training on local, state, and national policies, then take a Texas Commission on Law Enforcement licensure course. Then they receive one week of

hands-on training with the HEC's computers and phone systems, supervised by a certified trainer.

The training includes role-playing through stressful call scenarios. New hires are evaluated throughout the training for any noncompliance with policies and procedures. During the telecommunicators' first year of employment, a supervisor frequently monitors them.

After successfully completing the training, every new hire and the personnel who trained him or her must sign a form certifying that the new hire "can do the job." Only after certification and licensure do the telecommunicators start taking calls from the police department's 10-digit, non-emergency line. Later, they move to direct training on 9-1-1 calls.

As Breed acknowledged, "It is a very stressful job." Being a telecommunicator involves 12- to 16-hour days, unpredictable time off, and handling inappropriate comments from callers. Breed said that "your whole life is turned upside down when you become a 9-1-1 telecommunicator" because of how engrossing it is. She pointed out that telecommunicators who feel overwhelmed are encouraged to contact the Employee Assistance Program for confidential support.

***Procedure When a 9-1-1 Call Comes In***

When a 9-1-1 call comes in to the HEC, Breed said that the call systems automatically route the call "to the [telecommunicator] who has been available to

3

take the call the longest." According to C. Flores, a supervisor with the HEC and a former telecommunicator herself, it is possible—and common, during busy night shifts—for a telecommunicator to get a call immediately after ending another.

Breed testified that telecommunicators may release a call routed to them in one of three ways: pressing the "F" button on their keyboard, clicking the "release" icon by using their mouse, or going on "Not Ready" status via a button on the computer screen. Flores explained that, if a telecommunicator releases a call, the systems do not reroute it; the caller must call 9-1-1 again.

Breed testified that a telecommunicator's flagging himself or herself as "Ready" or "Not Ready" is one of the most important factors in evaluating a telecommunicator's job performance. Flagging "Not Ready" takes the telecommunicator out of the call queue, increasing the number of calls that the other telecommunicators must answer. Flores said that telecommunicators are evaluated in part by determining whether they meet at least six hours and 40 minutes of time logged in to work during a standard eight-hour shift. Flores said that "it is not proper procedure for a [telecommunicator] to put themselves on 'Not Ready' just—just to take a break."

Flores testified that, when a call is routed to a particular telecommunicator, he or she must say "Houston 9-1-1. Do you need medical, police, or fire?" within seconds of picking up the line. If the caller asks for police assistance, the

telecommunicator will conduct a "structured interview" using an outline of questions to ask the caller that are designed to elicit information helpful to the police. The caller's location, call-back information, and reason for calling are some of the primary pieces of information collected in a structured interview. The telecommunicator then summarizes the information collected in a "call slip," which police dispatch uses to send police officers to the location.

Telecommunicators are taught that they must not hang up on a 9-1-1 caller unless they have asked three times about the caller's emergency, using a specific script, and have gotten no response. Even then, the telecommunicator may not disconnect the line before activating a device to check for the possibility that the caller is hearing-impaired, and, usually, calling the caller back. The telecommunicator should not disconnect the line until the caller hangs up.

The HEC's "VESTA" phone system records data on all calls that a telecommunicator takes, providing a means for reviewing a specific telecommunicator's work for quality control. A quality-control review, according to Flores, involves listening to the audio of a random selection of a telecommunicator's calls "to make sure our procedures are being followed."

Breed does not know of any HEC telecommunicator ever being charged with interference with an emergency request for assistance.

### Williams's Hiring and Training

Williams's answers in her new-hire questionnaire indicated that she understood and accepted the particular difficulties of the job, including working nights and adjusting to a work schedule requiring some day-sleeping, making life-or-death decisions, and having her "job performance continuously watched."

Williams successfully completed all her new-hire training. She obtained her licensure and did not show any indication that she would not be able to do the job.

### Williams's Work Performance

Flores was Williams's supervisor for a time. At first, Flores did not notice any issue with Williams's performance, but that changed when Flores noticed some "call-handling issues," and Williams failed to meet the expected six hours and 40 minutes of login time "due to excessive breaks or coming back from break late." Flores compiled Williams's login and logout times on a form, showing the excessive breaks, and presented it to Williams, expressing concern about Williams's performance.

Williams failed to meet her hours requirement on one workday. Further investigation led to Flores's discovery that Williams had taken several unscheduled breaks and had placed herself on "Not Ready" status at inappropriate times. Flores counseled Williams about her having taken excessive breaks.

In addition, Flores discovered that Williams had been making calls that lasted under a few seconds, referred to as "short calls." According to Flores, some short calls are "legitimate," meaning that the telecommunicator's proper operation under policies and procedures results in the call being a short one, but "[t]oo many short calls is an indication that [telecommunicators are] not processing calls." Supervisors like Flores look at the number of short calls "to make sure that they're not hanging up on people."

Williams's performance also caught Flores's attention on another occasion. Another telecommunicator placed herself on "Not Ready" status and left her station to converse with Williams at her station, in violation of HEC policy. Telecommunicators are not supposed to talk to one another on the call-room floor; when on break, they are to leave the room entirely. Seeing the conversation, Flores approached Williams's station. The other telecommunicator walked away, and Flores asked Williams if she needed any help. Williams responded that she had needed the other telecommunicator's help with a call, so Flores went back to her own station to review the record of that call. Flores discovered that Williams had had several short calls in the hour before Williams said that she needed the other telecommunicator's help. Later, Flores compiled a report on Williams's short calls, using a sampling of calls from five workdays following the incident.

The report tallied the number of short calls that Williams had during the five-day period. Of that number, it tallied the number of instances in which Williams hung up first. Then, it focused on the number of those hang-up calls that resulted in return calls to the HEC with someone from the same phone number calling back and communicating to another telecommunicator a "major event," like needing police or fire assistance.

One such "major event" caller called 9-1-1 three times. Twice Williams hung up the call, and someone from the same number called back shortly thereafter. The State played the recordings of the three calls for the jury: the first was silent, and Williams hung up the call without speaking. The second, about 30 seconds later, involved Williams responding with the required opening phrase. The caller, trying to report a robbery, said the word "robbery," but Williams then hung up the call. The third call, about a minute later, was routed to a different telecommunicator, who completed the caller's request for emergency assistance. To Flores, Williams's termination of a call requesting help due to a robbery "was significant enough to report up the chain."

That 9-1-1 caller was H. Li. He testified that, on the day he called 9-1-1 to report a robbery—March 12, 2016—he was returning a DVD to, and buying a lottery ticket from, a gas station that he had been to many times. When he walked inside, he saw a robbery taking place: a man was holding a gun and was "trying to

8

push his way into a room inside the counter." Li ran out of the store, heard five or six gunshots, and quickly jumped into his car to call 9-1-1. Li feared that property could be destroyed during the robbery, or, worse, that someone had been shot.

The State played for the jury the recordings of Li's 9-1-1 calls. When he called 9-1-1, Li believed that he first "got disconnected." He remembered that this happened because "it was very weird to [him] that [he] got disconnected," but he didn't know why. He testified that he was unable "to request assistance" during the first call because it was disconnected. He said that he called back a couple of times; that it took him "[a]t least one or two" times to get through; and that, eventually, someone was able to answer his request. On cross-examination, he admitted that he was able to make the subsequent calls from his phone, and eventually request assistance, despite the prior disconnections.

### Investigation into Williams's Actions

Officer D. Vasquez of the Houston Police Department ("HPD") also testified. He performs special investigations for the Internal Affairs Division, including investigating potential criminal misconduct among officers and other City of Houston workers. He was assigned to the case involving Williams, described as an investigation into potential "misconduct on the part of a dispatcher with the" HEC for hanging up on callers.

Officer Vasquez interviewed HEC personnel, including Williams, and reviewed documents. Williams spoke with Officer Vasquez and other members of HPD voluntarily, and no charges were pending against her at the time. The officers told Williams that they were looking into some questions raised about calls going through the HEC and that the HEC had given the officers recordings of these calls and records relating to them.

Officer Vasquez testified that when he confronted Williams with the allegations against her, she "admit[ted] to hanging up on callers that were calling in." He recounted (i) that she explained her behavior by saying that "she had some personal issues she was going through" and (ii) that she "use[d] those personal issues as a justification for her behavior."

The recording of Williams's interview with the officers was admitted into evidence. In the recording, Williams acknowledged that, once a call has been routed to her, she is the telecommunicator who must deal with that call: the systems do not allow for that call to be rerouted. The officers also played the recording of Li's first 9-1-1 call for Williams during the interview. She responded by commenting that instances like that of complete silence happen "every now and then—not frequently." She went on to explain that, in situations where she answers a dead line, i.e., the caller has hung up before she can answer, she "call[s] them back because I don't know if something happened or if somebody dropped the

phone or somebody needs medical, so I call them back." She further observed that when someone dials but then hangs up, "you've got to call them back." She remarked that police often need to be dispatched to dead calls from payphones, which requires telecommunicators to take the call in the first place: "you still have to drop a slip because you don't know if somebody is playing on the phone or if there is actually something wrong."

The officers then played the recording of Li's second call for Williams. On hearing Li's abbreviated report of the robbery, she commented that "I don't know what happened with the call because she [sic] is talking about a robbery, so something is definitely—it's like something in progress. . . . If she's [sic] saying a robbery, that's something serious. With that kind of call, that's somebody that I would have called back."

The officers next showed Williams what they referred to as the results of a data download from the HEC's system, which they told Williams showed that she hung up on 9-1-1 calls at roughly five times the rate of the average telecommunicator. Williams did not immediately offer an explanation for her unusually high hang-up rate. A short time later, she told the officers that

> I would come to work some days and calls would get hung up on, but, it's like, when I'm taking a call and actually talk to some of the people, you know, I would finish the call. But there's something going on around me, and I'm frustrated that the supervisor pissed me off, or there's something going on with these extra things that they have us

11

going on, I would hang up on a call before the call actually came through.

She explained that she would hear the "beep" in her headset indicating that a call was routed to her, but, before she would hear the caller say anything or have a conversation with the caller, she would hang up the call. She did this, she said, "Because I didn't want to talk." She volunteered that, instead of hanging up on the callers, she could have simply been in "Not Ready" status, but she admitted that she didn't choose that option because her "Not Ready" time lets her supervisors "know I'm not taking calls" and because "Not Ready" time "is counted against me." She recalled that she hung up on calls "a lot" during a certain two-month period because that period coincided with a time of personal difficulty for her. Li's calls happened during that period.

G. Jordan, a fraud examiner with the Harris County District Attorney's Office, also testified. Jordan compiled and analyzed data provided by the HEC about the number of 9-1-1 calls lasting fewer than seven seconds handled by the 10 telecommunicators with the greatest number of such calls over the period from October 2015 to March 2016, inclusively. The analysis focused on calls where the 9-1-1 caller that was hung up on called 9-1-1 back within five minutes. Over the analyzed period, Williams had significantly more short calls of any duration under seven seconds than any of the other nine telecommunicators had.

Jordan also testified about his analysis of the HEC data concerning the short calls in which Williams hung up before the caller did. For the period from September 2014 through most of the month of March 2016, Jordan noted "jump[s]" in Williams's short calls in September, October, and November 2015 and in February 2016. He testified that the jumps began after Williams had been at the job for long enough for her supervisor to confirm that Williams could perform her job duties without being monitored so closely. Jordan noted that he "saw a difference between when she was being more closely supervised and later on."

*Trial*

Williams was tried by a jury for knowingly preventing or interfering with Li's 9-1-1 calls. The indictment described Williams's alleged act of preventing or interfering conduct as occurring "by disconnecting the phone call before the caller reported their emergency." The trial court denied Williams's motion for an instructed verdict, the jury returned a guilty verdict, and the trial court entered judgment on the verdict.

## Discussion

Williams's challenge to the sufficiency of the evidence is premised on her contention that the trial court erred in applying Penal Code section 42.062(a) to actions that she took in connection with her job as a 9-1-1 telecommunicator. Accordingly, we first address her claim that a telecommunicator cannot knowingly

prevent or interfere with a caller's ability to request assistance, as required to sustain a conviction under Section 42.062(a), then consider whether sufficient evidence supports her conviction.

## I.  Applicable standards of review

### A.  Statutory interpretation

Statutory construction is a question of law that we review de novo. *Yazdchi v. State*, 428 S.W.3d 831, 837 (Tex. Crim. App. 2014); *Jimenez v. State*, 446 S.W.3d 544, 550 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "[W]e are to construe a statute according to its plain language, unless the language is ambiguous or the interpretation would lead to absurd results that the legislature could not have intended." *Tapps v. State*, 294 S.W.3d 175, 177 (Tex. Crim. App. 2009) (quoting *Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008)). We read the text of the statute in context, construing it "according to the rules of grammar and common usage." TEX. GOV'T CODE § 311.011(a); *Tapps*, 294 S.W.3d at 177. If the statute is clear and unambiguous, the plain meaning of its words applies. *Hines v. State*, 75 S.W.3d 444, 447 (Tex. Crim. App. 2002). If, however, the statute is ambiguous, then a reviewing court may consider extratextual factors in arriving at a sensible interpretation. *See id.*

"[W]here application of a statute's plain language would lead to absurd consequences that the Legislature could not *possibly* have intended," we need not

adhere to the statute's unambiguous language. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991) (emphasis in original) (citing *Faulk v. State*, 608 S.W.2d 625, 630 (Tex. Crim. App. 1980)); *accord State v. Velasquez*, 539 S.W.3d 289, 292 (Tex. Crim. App. 2018). Further,

> If the plain language of a statute would lead to absurd results, or if the language is not plain but rather ambiguous, then *and only then*, out of absolute necessity, is it constitutionally permissible for a court to consider, in arriving at a sensible interpretation, such *extra*textual factors as executive or administrative interpretations of the statute or legislative history.

*Boykin*, 818 S.W.2d at 785–86 (emphases in original).

### B.    Sufficiency of the evidence

A challenge to a trial court's ruling on a motion for a directed verdict is a challenge to the sufficiency of the evidence to support the conviction. *See Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App. 2003); *Briggs v. State*, 455 S.W.3d 711, 712 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Evidence-sufficiency challenges are reviewed under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Lee v. State*, 537 S.W.3d 924, 926 (Tex. Crim. App. 2017). Under this standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011).

Under this standard, evidence generally is insufficient in any one of four circumstances: (1) no evidence exists that is probative of an element of the offense in the record; (2) only a modicum of evidence exists that is probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; or (4) the alleged acts do not establish the offense charged. *See Buentello v. State*, 512 S.W.3d 508, 515 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (citing *Jackson*, 443 U.S. at 314, 320; *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)).

An appellate court determines whether the inferences that the jury drew in convicting "are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *See Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). In viewing the record, direct and circumstantial evidence are treated equally. *See id.* at 13. Circumstantial evidence is as probative as direct evidence is in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id.* An appellate court presumes that the jury resolved any conflicting inferences in favor of the verdict and defers to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court also defers to the jury's evaluation of the credibility and weight of the evidence. *See Williams*, 235 S.W.3d at 750.

16

## II. Preventing or interfering conduct under Section 42.062(a)

Williams was convicted under Penal Code section 42.062(a), which provides:

> An individual commits an offense if the individual knowingly prevents or interferes with another individual's ability to place an emergency call or to request assistance, including a request for assistance using an electronic communications device, in an emergency from a law enforcement agency, medical facility, or other agency or entity the primary purpose of which is to provide for the safety of individuals.

Neither the Court of Criminal Appeals nor this court[2] has interpreted the language of Section 42.062(a) in a prosecution of a 9-1-1 telecommunicator. In addressing an appeal of a conviction under the statute, however, the Second Court of Appeals concluded that the offense comprises the following elements:

> (1) an individual
> (2) knowingly
> (3) prevents or interferes with
> (4) another individual's
> (5) ability . . .[3] to request assistance, including a request for assistance using an electronic communications device,

---

[2]    A prior panel of this court applied Section 42.062(a) in *Vinson v. State*, 266 S.W.3d 65 (Tex. App.—Houston [1st Dist.] 2008, no pet.). *Vinson* dealt with a harm analysis of erroneously admitted hearsay testimony and an appellant who had punched the victim while the victim tried to call 9-1-1 and who had pulled the phone from the victim's hands. *See id.* at 69–70. *Vinson* is therefore procedurally and factually distinguishable and does not offer guidance on the issues Williams raises here.

[3]    The statute says "another individual's ability to place an emergency call or to request assistance, . . . " but we omit "to place an emergency call" from our analysis because the charging instrument here omitted it. *See Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (instructing that

17

(6) in an emergency

(7) from a law enforcement agency[, medical facility, or other agency or entity the primary purpose of which is to provide for the safety of individuals].

*Schumm v. State*, 481 S.W.3d 398, 399–400 (Tex. App.—Fort Worth 2015, no pet.) (line-spacing added).

Penal Code section 6.03(b) provides that a person acts "knowingly"

with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

In determining whether a defendant acted knowingly, the jury may consider the defendant's acts, words, and conduct; the circumstantial evidence surrounding the incident; and the method that the defendant used to commit the crime. *See Laster*, 275 S.W.3d at 524; *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Ramirez v. State*, 229 S.W.3d 725, 729 (Tex. App.—San Antonio 2007, no pet.). The jury may rely on its collective common sense for this determination. *See Ramirez*, 229 S.W.3d at 729; *Rodriguez v. State*, 90 S.W.3d 340, 355 (Tex. App.— El Paso 2001, pet. ref'd).

The Penal Code does not define "prevent," "interfere," or their variants. When words are not defined in a statute, they are ordinarily given their plain

---

evidence-sufficiency determinations are made according to the statutory elements of the offense charged "and those elements as modified by the indictment" or other charging instrument).

meaning unless the statute clearly shows that they were used in some other sense. *See Daniels v. State*, 754 S.W.2d 214, 219 (Tex. Crim. App. 1988). If the meaning of the statutory text should have been plain to the legislators who voted on it, then we ordinarily give effect to that plain meaning. *State v. Robinson*, 498 S.W.3d 914, 920 (Tex. Crim. App. 2016). The Court of Criminal Appeals has considered a relevant variant of "interfere" only in *Hines*. *See* 75 S.W.3d at 447. The court of appeals had interpreted the statutory term "interfere substantially" as requiring "more than temporary confinement or slight movement which is part and parcel of the commission or attempted commission of another substantive criminal offense." *Hines v. State*, 40 S.W.3d 705, 713–14 (Tex. App.—Houston [14th Dist.] 2001), *rev'd*, 75 S.W.3d 444 (Tex. Crim. App. 2002). Before the Court of Criminal Appeals, the defendant argued that "interfere substantially" must include the court of appeals' qualifiers on top of the phrase's common meaning in order to avoid absurd results. *See Hines*, 75 S.W.3d at 446–48. The Court held that "interfere substantially," as it relates to restraining a victim's liberty for purposes of proving an aggravated kidnapping, is unambiguous and is a phrase "that in its common use does not generally have such an involved, complicated meaning as to require a defining thereof." *Hines*, 75 S.W.3d at 447.

"Courts may consult standard dictionaries in determining the fair, objective meaning of undefined statutory terms." *Lang v. State*, 561 S.W.3d 174, 180 (Tex.

19

Crim. App. 2018). Black's Law Dictionary defines "interference" as, among other meanings not relevant here, "[a]n obstruction or hindrance" and identifies its verb form as "interfere." *Interference*, BLACK'S LAW DICTIONARY (10th ed. 2014). Consistent with common usage then, to "interfere" may be reasonably understood to mean "to obstruct or hinder."

The Second Court of Appeals applied the definition of "prevent" that is "[t]o hinder or impede" in addressing a conviction for resisting arrest. *See Clement v. State*, 248 S.W.3d 791, 802 (Tex. App.—Fort Worth 2008, no pet.) (quoting *Prevent*, BLACK'S LAW DICTIONARY (8th ed. 2004)); *accord Prevent*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("To stop from happening; to hinder or impede."). Accordingly, to "prevent" may be reasonably understood to mean "to hinder or impede."

## III. The evidence was sufficient to establish that Williams knowingly prevented or interfered with Li's ability to request assistance.

In challenging her conviction under Section 42.062(a), Williams does not contest the sufficiency of the evidence that she is an individual, that Li is another individual, that Li called 9-1-1 to request assistance with an emergency, or that the HEC is an agency or entity whose primary purpose is to provide for the safety of individuals. Williams does, however, challenge the sufficiency of the evidence that she knowingly prevented or interfered with Li's ability to request assistance. We address these elements, each in turn.

## A. "Prevents or interferes with"

Williams argues that the statute was not intended to encompass telecommunicators but was instead intended to focus on "protect[ing] against angry boyfriends smashing the phone or grabbing the phone from someone's hand." According to her, either smashing or grabbing a phone involves conduct that physically affects the caller's phone and is done while with or near the caller. She claims that these acts constitute prevention or interference with a phone call. By contrast, she asserts, her hanging up on calls to the HEC do not affect physical components and therefore cannot be acts of prevention or interference. In other words, for purposes of Section 42.062(a), Williams distinguishes "a private citizen who physically interferes with another person's ability to place a call to 9-1-1" from "a public servant's failure to perform her job duties."

Williams claims that, because she "was not physically present," she "had no way of preventing [Li] from making the call." She also says that she "dropped the call" both times "in accordance with her training" and that telecommunicators "are following policy when they reject a call they are not prepared to accept." She notes that she "did not shut down the operating system."

To support her position, Williams points to Breed's testimony that she knows of no HEC telecommunicator ever having been charged under Section 42.062(a). HEC telecommunicator training addresses potential civil liability or

21

administrative reprimand for any work deficiencies but not potential criminal liability. According to Williams, the HEC had no "reason to offer an instruction on criminal liability for poor job performance because poor job performance did not violate any criminal statute."

Finally, Williams claims that the fault for any delay in responding to Li's call for emergency assistance belongs to the HEC systems, not to her. Each time Li's calls were dropped, the systems disconnected them instead of rerouting them to another telecommunicator. The systems' deficiencies absolve her of criminal liability, Williams contends, because they do not "properly deal with" a telecommunicator-dropped call.

Under the unambiguous language of Section 42.062(a), "prevents or interferes with" means "hinders, impedes, or obstructs." Contrary to Williams's proffered interpretation, the statute does not require physical interference, nor does it allow Williams to deflect blame on the computer and phone systems when she was trained on them and thus was aware of their limitations.

The evidence was sufficient to allow the jury rationally to find that Williams hindered, impeded, or obstructed Li's ability to request emergency assistance. Williams dropped Li's two 9-1-1 calls while he was trying to report a robbery in progress. Williams hung up the second call even though Li uttered the word "robbery." The HEC's systems routed Li's calls to her, and she—not Li—hung up

22

on both calls. Williams hindered, impeded, or obstructed Li's attempt to request assistance during each of the two calls when she ended them. Li had to call a third time and reach a different telecommunicator before he could communicate the necessary information about the robbery.

After the police confronted Williams both with recordings of the two calls and with her short-call volume, she admitted that she hung up on callers at times because of her own anger or frustration. Williams also admitted to the officers that she would receive notification that a call was routed to her, but, without speaking or listening for the caller to speak, she would hang up the call. The evidence supports the reasonable inference that Williams hung up on Li's two calls for the same reasons.

Williams's proposed limits on the meaning of "prevents or interferes with" fail because they are not anchored in the statute's use of those words or their common meanings. Section 42.062(a) does not require the defendant's physical presence near the caller, nor does it require that the preventing or interfering conduct physically affect the caller's phone. Those circumstances may commonly arise in Section 42.062(a) prosecutions, but the common meanings of "prevents or interferes with" do not require them.

We decline Williams's invitation to limit Section 42.062(a)'s application in the way she proposes. In *Hines*, the Court reversed a judgment that imposed

temporal and physical limits on the statutory term "interfere substantially," concluding that its common meaning did not include them. *See* 75 S.W.3d at 446 (quoting, and rejecting, 40 S.W.3d at 713–14). In keeping with *Hines*, we conclude that Section 42.062(a) does not require physical interference to prove that a person prevented or interfered with another's ability to call for emergency assistance.

Williams refers to her telecommunicator training as support for her position that telecommunicators are not preventing or interfering with 9-1-1 calls when they hang them up, but she does not point to anything specific in the record. In her testimony, Breed described the methods a telecommunicator may use to drop a call, but these methods do not address when a telecommunicator *should* drop a call. And although Williams may be correct that few, if any, other telecommunicators have been prosecuted under Section 42.062(a), this observation does not affect whether the statute's plain language encompasses her conduct.

The State points out that Williams's proposed physical-interference requirement would immunize from conviction people who cut the phone lines to a home or business to prevent another from using a landline to call 9-1-1, those who install a secret call-blocking app that prevents initiation of 9-1-1 calls from their significant other's smartphone, or those who remotely disable their significant other's phone during a 9-1-1 call. Each of these hypotheticals lacks the immediate physical interference that is also absent from this case. But immunizing those who

engage in the conduct described in these hypotheticals is more likely to yield an absurd result than finding Williams guilty under the statute is, when the plain language of the statute encompasses those examples of conduct.

Williams replies (1) that "applying this statute to the very public servants whose job performance puts them at risk of violating a criminal statute is an absurd result" and (2) that, if the HEC's systems "fail[] to function in the most efficient manner, as here, it would be absurd to hold the individual operator criminally liable for the consequences of" the systems' failure.

The first argument misses the mark. Williams's conduct was not merely deficient job performance; it was deficient job performance that hindered or obstructed Li's attempt to request emergency assistance because of a robbery. Public servants are generally not immune from criminal liability by dint of their office or employment: several penal statutes specifically target public servants when they act in furtherance of, or under color of, their office or employment. *See, e.g.*, TEX. PENAL CODE §§ 39.01–.07 (defining offenses that constitute abuse of office); *State v. Edmond*, 933 S.W.2d 120, 124–27 (Tex. Crim. App. 1996) (applying official-oppression penal statute so as to avoid constitutional and absurdity problems).

Williams's second argument describes a scenario that this case does not present. Nothing in the record suggests that a flaw in the HEC's systems caused

25

Li's two calls to disconnect. The record shows only that Williams ended the calls. The fact that the system does not automatically reroute calls when a telecommunicator disconnects them does not affect our analysis because, by that point, Williams had already completed the preventing or interfering conduct.

We therefore hold that the evidence is sufficient to support the jury's finding on the "prevents or interferes with" element and that application of the common meaning of those words did not lead to an absurd result in this case.

## B.    "Knowingly"

Williams also disputes that she acted knowingly in preventing or interfering with Li's requests for emergency assistance. She argues that she "was unprepared to take the call and so she dropped it allowing [Li] to call again and another emergency operator to assist him." Pointing to other operators with high numbers of dropped short calls, Williams also argues that "[t]he operators do not intentionally and knowingly interfere with the caller's ability to call 9-1-1 every time they drop a call." If dropping a call constitutes a knowing interference with a caller's ability to request assistance, she claims, all of the telecommunicators would be subject to "criminal liability on a daily basis for doing their job as instructed" because any telecommunicator can become unable to perform his or her job duties at any time.

Williams's arguments misapprehend the level of intent required for conviction under the statute. "A person acts knowingly . . . with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." TEX. PENAL CODE § 6.03(b).

Several statements made during Williams's police interview are probative of her knowing intent. First, she acknowledged that once a call has been routed to her, the HEC's systems do not reroute it to another telecommunicator—she alone must deal with that call. After listening to the recording of Li's first call, she explained that, in situations where the caller has hung up before she can answer, she "call[s] them back because I don't know if something happened or if somebody dropped the phone or somebody needs medical, so I call them back." She further explained that when a caller hangs up, "you've got to call them back." She went on to say that when calls come in from payphones, telecommunicators must take information from a caller and record the payphone's location on a call slip so that police can be dispatched, explaining that "you still have to drop a slip because you don't know if somebody is playing on the phone or if there is actually something wrong." On hearing the recording of Li's second call, Williams remarked, "I don't know what happened with the call because she [sic] is talking about a robbery, . . . it's like

27

something in progress. . . . If she's [sic] saying a robbery, that's something serious. With that kind of call, that's somebody that I would have called back."[4]

Finally, after explaining to police that she hung up on calls for a time because of difficult circumstances in her life, she confirmed that she did so "because I didn't want to talk." She volunteered that, instead of hanging up on calls, she could have been in "Not Ready" status, but she did not choose that option because "Not Ready" status alerts her supervisors that she is "not taking calls" and "is counted against" her. She recalled that she hung up calls "a lot" during a two-month period that coincided with a time of personal difficulty. She admitted that Li's calls happened during that period.

We conclude from this evidence, in addition to that recounted above under the "prevents or interferes with" element, that the jury could rationally have found that by hanging up on Li's calls despite this knowledge, Williams knowingly engaged in the preventing or interfering conduct.

---

[4]    At oral argument, Williams's counsel also suggested that the statute's "knowing" mental state attaches to the defendant's awareness of the emergency giving rise to the 9-1-1 call—that the State must prove that Williams knew of the character of Li's emergency. Williams did not brief that argument, so we do not analyze it, but we note that Williams ended Li's second call after hearing him say "robbery" and that, when confronted with the recording of that call in her interview with police, she volunteered that a caller reporting a robbery is one who she would call back if the call were disconnected.

## C. "Ability . . . to request assistance"

Williams contends that the evidence is insufficient to establish that her actions prevented or interfered with Li's "ability . . . to request assistance." She argues that "Li was able to and indeed did, successfully call 9-1-1. Ms. Williams was not physically present and had no way of preventing him from making the call." As to dropped calls more generally, she says that even when telecommunicators intentionally drop a call, "nothing prevents the caller from calling back." Therefore, though "Williams may have knowingly dropped many calls, and may have knowingly dropped the call alleged in this case, . . . she did not prevent the caller here, nor any other dropped caller, from contacting 9-1-1 for emergency assistance." Li "was able to place three calls to 9-1-1."

Contrary to Williams's position, Section 42.062(a) does not require the State to prove a complete and indefinite foreclosure of the victim's ability to request assistance. Li testified that, when he first called 9-1-1, he "got disconnected," and "it was very weird to [him] that [he] got disconnected," but he did not know why it had happened. He was unable "to request assistance" during the first call because it disconnected. It took him "[a]t least one or two" times to get through, and, eventually, someone was able to respond to his request. We hold that the evidence is sufficient for the jury rationally to find that Williams's actions prevented or interfered with Li's ability to request assistance.

29

## Conclusion

We affirm the trial court's judgment.

Gordon Goodman<br>
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.

Publish. TEX. R. APP. P. 47.2(b).